## UNITED STATES of America

v.

Jonathan ADEOSUN, a/k/a Muyiwa Robert Cole, Zazamaniiyai Paul Lekwut, Zamani Lekwut, and Joe the Nigerian, Olanike Kayode, a/k/a Laura Black, Sandra Foster, Kayode Olanike, and Nikkie Kayode, Ayodele Hambolu, Christopher Miller, Defendants.

No. Crim.A. 98–0395(JR).

United States District Court, District of Columbia.

May 26, 1999.

M. Jeffrey Beatrice, Assistant U.S. Attorney, Washington, DC, for United States.

David Carey Woll, Montgomery Village, MD, for defendant Adeosun.

Gerald I. Fisher, Fisher & Hansen, PC, Washington, DC, for defendant Kayode.

Joanne Hepworth, Washington, DC, for defendant Hambolu.

James Thomas Maloney, Washington, DC, for defendant Miller.

### *MEMORANDUM*

JAMES ROBERTSON, District Judge.

This memorandum sets forth the reasons for the rulings made in open court on April 19, 1999, denying the separate motions of defendants Adeosun, Hambolu and Kayode to suppress evidence and statements, the motion of defendant Adeosun for severance, and the motion of all defendants for misjoinder and to sever, as well as the accompanying order disposing of the motion to suppress evidence taken from the trunk of the car defendant Hambolu was driving.

Defendants are charged by indictment with bank fraud (18 U.S.C. § 1344), conspiracy to commit money laundering (18 U.S.C. § 1956(h)), structuring transactions to avoid reporting requirements (31 U.S.C. § 5324(a)(3)), possession of false identification documents (18 U.S.C. § 1028(a)(3)), and access device fraud (18 U.S.C. § 1029(a)(2)). The following facts were established at a hearing on defendants' motion:

On or before October 8, 1998, a loan officer at the 1509 Pennsylvania Avenue, N.W., Washington, D.C. branch of NationsBank notified the Metropolitan Area Fraud Task Force ("Task Force") that a six foot tall, 200 pound "white male with reddish hair" had fraudulently applied for a loan in the name of "Peter Taschner." Transcript (Mar. 16, 1999) at 49, 150. The Task Force advised the loan officer to tell the impostor to pick up the proceeds of his loan at noon on Tuesday, October 13, 1998. Tr. at 51. At eleven o'clock on October 13, the Task Force set up surveillance inside and outside the bank. Officers were stationed outside because, by training and experience, Task Force members knew that "[i]t's common practice for individuals to show up at the bank in groups [and that one] individual will be waiting outside in the car." Tr. at 53. They also knew that in many bank fraud cases the person actually entering the bank acts as a "mule"— the person who "is at most risk to be arrested" and who "will be the one who spends the night in jail and not the actual person who sent him into the bank." Tr. at 146–47.

When the suspect did not arrive by noon, the loan officer telephoned him at the Task Force's request. The suspect told the loan officer that he would come to the bank.[1] Approximately one and one-half hours later, Tr. at 55–56, 84, a man fitting the description of the primary suspect arrived in the back seat of a car driven by a black male. Another black male was in the front passenger seat. The driver, who turned out to be defendant Hambolu, momentarily stopped the car in front of a fire hydrant, drove around the block once, and then returned to the same no-parking zone in front of the hydrant. He remained there with the engine running. Tr. at 151. The primary suspect, who turned out to be defendant Miller, exited the car and "walked up 15th street, crossed over, came back down, and then walked to the first entrance, then the second entrance of the bank." Tr. at 61. After Miller entered the bank, the front passenger, who was defendant Adeosun, exited the car, crossed 15th Street directly, and entered the bank. Tr. at 62. By the time Adeosun entered the bank, Miller and the loan officer had entered a cubicle separated from the main room by tinted (but transparent) glass. Tr. at 85. Adeosun stood in a teller line, continuously glancing at Miller and looking about the bank. Tr. at 62. When Adeosun reached the teller window, he deposited $70 and withdrew $20 in rolls of quarters, Tr. at 63, then headed for the exit door without acknowledging Miller. Tr. at 89–90. As Adeosun exited the bank, he was detained by Special Agent Funk and arrested. Tr. at 91. The arresting officers took from him a bank deposit slip, his wallet, and a pager. Tr. at 94.

As defendant Adeosun was being arrested, the Task Force members outside the bank were ordered, via radio, to detain the driver of the car in which Miller and Adeosun had arrived. Tr. at 126, 151. The driver, defendant Hambolu, had remained in the same no-parking zone on 15th Street, where he had been under continuous surveillance by four members of the Task Force. Tr. at 66. Those officers

---

1. As they waited for Miller to arrive, the loan officer told a Task Force member that her noon telephone call to Miller had been answered by someone with an "accent." Tr. at 133. This shard of information caused Task Force members to speculate that Nigerians might be involved, but the "very small inference" was not recorded in any official report. Tr. at 134

observed Mr. Hambolu talking on a cellular phone. Tr. at 115. Upon receiving the radio notice from within the bank, they approached the car and told defendant Hambolu, who was still in the driver's seat, to put his hands up. Agent Mignogna reached in and turned off the ignition. Tr. at 68. Sgt. Flynn noticed two "victim profiles"[2] on the center console, positioned so that Hambolu could read the top one, which bore the highlighted name "Peter Taschner"—the same name about which the Task Force had been briefed. Tr. at 71.

Hambolu was asked to identify himself and said his name was "Ayo Hambolu." Sgt. Flynn, recognizing Hambolu from a previous bank fraud investigation, said, "No. It's Ayodele Hambolu." Mr. Hambolu replied, "Yeah, that's who I am." Tr. at 68–69. Sgt. Flynn asked Hambolu why he was waiting in the car. When Hambolu responded that he was waiting for his "boss" who was inside the bank, he was arrested. Tr. at 70.

The arresting officer searched Hambolu's person and the passenger compartment of the car incident to the arrest. They seized Hambolu's wallet and pager and two cellular telephones. Tr. at 73. The officers also searched the trunk of the car, recovering a briefcase in which they found victim profiles for two more individuals. Tr. 72.

After the arrests of Miller, Adeosun, and Hambolu, the Task Force applied for a warrant to search the apartment occupied by Adeosun and his wife, Olanike Kayode. They were concerned that Ms. Kayode might destroy evidence once she realized that her husband had been arrested, however, and so they decided to secure the apartment while awaiting issuance of the warrant. Several agents reached the

apartment, at 1843—24th Street, N.E., sometime after 9:00 p.m. on the day of the arrest. What happened next is disputed.

Agent Funk testified that the agents were admitted after they knocked and announced their identity and purpose, but that they were not given consent to search. He said the agents did a safety sweep and then sat down and watched television until, twenty to forty minutes later, they were notified by radio and telephone that the warrant had been signed. He said that the search began ten minutes after that, when the actual warrant appeared.

Defendant Kayode testified that the agents began searching immediately after they arrived. She also said that she had a clear view of the storage locker in the laundry room nearby (but outside her apartment) and that, from her vantage point, she could see that the wire on the storage locker had been ripped off. That testimony suggested, but did not quite say, that the agents were also searching the storage locker before the warrant actually arrived.

*Adeosun's motion to suppress*[3]

Defendant Adeosun seeks to suppress the bank deposit slip, pager and wallet taken from him at the time of his arrest, asserting that his arrest was not supported by probable cause. Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent law enforcement officer in light of his training and experience. *United States v. Lincoln,* 992 F.2d 356, 358 (D.C.Cir.1993); *United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981). The circumstances surrounding Adeosun's arrest were these: The Task Force officers were observing a crime in progress. By training and experience, they knew that bank fraud is usually carried out by sever-

---

**2.** A victim profile contains personal information about a victim that can be used to defraud financial institutions. Tr. at 71–72.

**3.** This discussion concerns Adeosun's motion to suppress tangible evidence recovered from

Adeosun after his arrest. Adeosun's motion to suppress incriminating statements was granted from the bench. Transcript (Apr. 19, 1999) at 20.

al suspects working together, and that often a "mule" will conduct the actual transaction at the direction of a second party with a more senior role in the criminal enterprise. Miller and Adeosun arrived at the bank in the same car but approached the bank in a manner apparently calculated to disassociate them from one another. Once inside, by failing to acknowledge one another, they demonstrated a detachment not typical of even the most casual acquaintances.

These circumstances, which might appear innocent to the untrained eye, must be considered in light of the officers' training and experience, as well as the information they received at the pre-surveillance briefing. The officers reasonably concluded that Adeosun was not innocently present in a place where criminal activity was going on.[4] *See United States v. Meade,* 110 F.3d 190, 199 n. 13 ("[O]fficers in the field are not required to ignore the fact that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences.") (quotation marks and citation omitted) (quoting *U.S. v. Martinez–Molina,* 64 F.3d 719, 729 (1st Cir.1995)). The information available to the Task Force revealed "substantially more than a momentary, random, or apparently innocent association between [Adeosun] and [defendant Miller's] known criminal activity." *Meade,* 110 F.3d at 198–99. *See also United States v. Gilliam,* 167 F.3d 628, 633 (D.C.Cir.1999). There was ample probable cause for Adeosun's arrest.

*Defendant Hambolu's motion to suppress tangible evidence*

■ Defendant Hambolu claims that he was arrested on less than probable cause and seeks to suppress evidence seized from the car in which he was sitting while waiting for Adeosun and Miller. I found

the testimony of agents Funk and Pickett and Trooper Mignogna fully credible on the subject of Hambolu's arrest. They suspected that the driver of the vehicle that carried Miller and Adeosun to the bank was involved in the fraud, because their experience and training had taught them that bank fraud perpetrators seldom work alone and normally will employ a "getaway car." As they approached the car, one of them saw in plain view on the car's center console two "victim profiles," one bearing the name "Peter Taschner"— the name in which the fraudulent transaction had just been conducted inside. No more was necessary to establish probable cause for Hambolu's arrest.

■ A pager, a wallet, and the victim profiles that were in plain view in the car were properly seized during a search incident to Hambolu's arrest. Such a search is limited to the arrestee's person and the passenger compartment of a car, *New York v. Belton,* 453 U.S. 454, 460 n. 4, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), unless the officers had a probable cause justifying "the search of every part of the vehicle and its contents that [might] conceal *the object of the search." United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (emphasis added). *See United States v. Turner,* 119 F.3d 18 (D.C.Cir.1997). The question here is whether the discovery of two victim profiles on the center console, one bearing the name "Peter Taschner," gave rise to probable cause to believe that further evidence of the same crime or evidence of additional financial crimes might be found in the trunk. If so, the officers were authorized to search the car as thoroughly as if a magistrate had authorized "a warrant particularly describing the place to be searched" and to open closed packages they encountered. *Ross,* 456 U.S. at 800,

---

4. He was not like the bar patron in *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The victim profiles were not like the counterfeit gasoline ration tickets in *United States v. Di Re,* 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948), "pieces of paper ... carried in the pockets of the driver."

102 S.Ct. 2157; *United States v. Caroline,* 791 F.2d 197, 202 (D.C.Cir.1986).[5]

Given the nature of the crime under investigation and the totality of the circumstances existing at the time of Hambolu's arrest, a reasonably prudent officer could have believed there was probable cause to search the entire car for more "victim profiles" or similar instrumentalities, or evidence, of the bank fraud. In *Turner,* the discovery of items consistent with marijuana use—"torn pieces of cigar tobacco" and "a hollowed out cigar 'blunt,'"—and a "clear plastic bag of green, weed-like material" in the passenger compartment of a lawfully stopped car, 119 F.3d at 19–20, provided probable cause to search the vehicle's trunk. *Id.* at 22–23. *See also United States v. Hough,* 944 F.Supp. 20, 23 n. 2 (D.D.C.1996) (probable cause to search entire car, including trunk, arose when officer, "during a lawful stop, smelled marijuana and observed the remains of marijuana cigarettes in plain view").

The *Turner* decision strongly suggests a "bright line" rule applicable to this case— that probable cause to search an entire car, including the trunk, comes into existence when evidence of crime is discovered in the passenger compartment during a search incident to the arrest of the driver. The exact holding does not go so far, to be sure, but the rule is implied in a footnote— "Here, the question is ... whether an actual finding of drugs in one location supplies probable cause to believe there may be additional drugs in another," 119 F.3d at 224 n. 4—and proceeds from the facts of

that case, which are analogous to the facts of this one.[6]

It is true that the *Turner* decision, like virtually every other decisional analysis of probable cause for arrests and warrantless searches, recites its reliance in part upon the "experience and training" of the police officer involved. The testimony at the suppression hearing noted that the four officers outside the bank who had Hambolu under surveillance were indeed experienced officers, but nobody testified precisely that "experience and training" led them from the passenger compartment to the trunk after the discovery of the victim profile.

If the "particular viewpoint of the officer involved in the search or seizure," *United States v. Prandy–Binett,* 995 F.2d 1069, 1071 (D.C.Cir.1993), is a *sine qua non* of the probable cause determination, then it must be acknowledged that this record contains no evidence upon which that viewpoint—and the training and experience informing it—can be evaluated. Requiring evidence of the state of mind of the officer who decided to open the trunk, however, invites police officer testimony that cynically pays lip service to a rule, and makes prophecy of the dissent in *Prandy–Binett,* 995 F.2d at 1074: " 'Probable cause' now means that police officers can act solely on a 'hunch' or 'intuition,' which, as here, will be characterized by the court as 'specialized experience and training.' "

In my view, the *Turner* decision and the totality of the circumstances are enough to establish probable cause for the officers to extend their search to the trunk of the car Hambolu was driving after they found vic-

---

**5.** The discovery of the briefcase and its contents was not inevitable, for there is no record evidence of an impoundment and inventory procedure. *Cf. United States v. Gale,* 952 F.2d 1412, 1416 (D.C.Cir.1992) (applying inevitable discovery doctrine).

**6.** The facts of *Turner* case and the facts of other trunk search cases the court found persuasive, 119 F.3d at 20, all involved drugs, a commodity perhaps more likely to be secreted in trunks than documentary evidence of finan-

cial crime. The distinction between contraband (drugs) and evidence (victim profiles) disappeared long ago, however. *Warden v. Hayden,* 387 U.S. 294, 300–01, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)(rejecting so-called "mere evidence" rule). *See* Eldon D. Wedlock, Jr., *Car 54—How Dare You!: Toward a Unified Theory of Warrantless Automobile Searches,* 75 Marquette L.Rev. 79, 100–01 (1991).

tim profiles in plain view in the passenger compartment. The motion to suppress the tangible things seized from Hambolu's briefcase, which was found in the trunk, will accordingly be denied.

*Defendant Kayode's motion to suppress tangible evidence*

 Defendant Kayode moves to suppress evidence seized from her home and from a storage locker in her apartment building. She argues that the search was made without a warrant and was not supported by probable cause. She alleges that the officers went beyond securing her home to prevent the destruction of evidence and that, in fact, they began searching before the warrant arrived and perhaps before 11:37 p.m., when the warrant was issued.

There is a square dispute between Agent Funk and Ms. Kayode as to when the search began. Since there was probable cause to search Ms. Kayode's apartment for evidence of bank fraud, however, this dispute is only material if Ms. Kayode alleges or demonstrates that the warrant was procured using unlawfully seized information. *Murray v. United States*, 487 U.S. 533, 542 n. 3, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) ("[W]hat counts is whether the actual illegal search had any effect in producing the warrant"). If, that is, agents first searched the apartment without a warrant and then used the fruits of the search to persuade a magistrate to issue the warrant, the fruits of the search conducted pursuant to that warrant would have to be suppressed. *Cf. Murray*, 487 U.S. at 543–44, 108 S.Ct. 2529. Here, however, there is no showing or even argument that the search of Ms. Kayode's home influenced the agents' decision to apply for a warrant. *Cf. Murray*, 487 U.S. at 544, 108 S.Ct. 2529 (remanding case for determination of whether a warrant would have been sought in the absence of the warrantless search).

Ms. Kayode's testimony about the removal of evidence from the house was self-interested and, in any event, not specific as to time. I have no credible basis on which to find that evidence was actually removed from Ms. Kayode's residence before the warrant was signed.

Defendant Kayode's motion to suppress will be denied.

*Defendant Adeosun's motion to sever counts*

 Defendant Adeosun moves to sever the money laundering count (Count Five) from the bank fraud counts (Counts One through Four); the possession of false identification count (Count Seven) from Counts One through Four and Five; and Counts Six and Eight, structuring transactions to evade reporting requirements and access device fraud, in which only his wife is charged, from the others. Because it is clear on the face of the indictment that all of these offenses are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan," Fed.R.Crim.P. Rule 8(a), the motion lacks merit and will be denied.

*Motion for misjoinder and to sever counts and defendants*

 All defendants move for misjoinder and to sever counts and defendants, asserting that defendant Kayode is improperly joined with her co-defendants and that the counts are improperly joined under Rule 8(b). What this motion adds to the previously discussed Rule 8 motion of defendant Adeosun is an argument made under *Drew v. U.S.*, 331 F.2d 85, 88 (D.C.Cir. 1964), and Rule 14, that the defendants may become embarrassed or confounded in presenting separate defenses, the jury may use the evidence of one of the crimes charged to infer criminal disposition on the part of the defendant to commit other crimes charged, or the jury may cumulate the evidence of various crimes charged and find guilt where it would not so find with respect to any separate charge. Again, the indictment adequately alleges partic-

ipation by all four defendants in the same series of acts and transactions of the same or similar character connected together and constituting parts of a common scheme or plan. All four defendants are charged with being part of the scheme to commit bank fraud set forth in Counts One through Four, and that, by itself, is enough to support a single trial. *See U.S. v. Brown,* 823 F.2d 591, 598 (D.C.Cir.1987). As for the assertion of defendants Kayode and Hambolu that their trial should be severed because of the possibility of calling co-defendants as witnesses in their behalf, no defendant has made or proffered the showing required by *U.S. v. Ford,* 870 F.2d 729, 731 (D.C.Cir.1989). Nor has any defendant made a showing or a proffer about how there might be irreconcilable conflicts in their defenses. Absent such a showing, the motions for misjoinder and to sever must be denied.

An appropriate order accompanies this memorandum.

### ORDER

For reasons stated in the accompanying memorandum, it is hereby

**ORDERED** that defendant Hambolu's motion to suppress tangible evidence [# 62], taken from the trunk of the car he was driving, is **denied.**