UNITED STATES of America,
Appellee,

v.

Olanike KAYODE, *a/k/a* Laura Black,
*a/k/a* Nikkie Kayode, *a/k/a* Kayode
Olanike, *a/k/a* Sandra Foster, Appellant.

No. 00–3025.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 10, 2001.

Decided June 29, 2001.

Lexi Negin–Christ, appointed by the court, argued the cause for the appellant.

Mary B. McCord, Assistant United States Attorney, argued the cause for the appellee. Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on brief for the appellee.

Before: GINSBURG and HENDERSON, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

A jury convicted Olanike O. Kayode of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), money structuring in violation of 31 U.S.C. § 5324(a)(3), access device fraud in violation of 18 U.S.C. § 1029(a)(2) and possession of false identification in violation of 18 U.S.C. § 1028(a)(3). On appeal she challenges certain evidentiary rulings of the district court, asserts the evidence was insufficient to support two counts of her conviction and argues her sentence was erroneously imposed. For the reasons set forth below, we affirm.

I.

In October 1998 Christopher Miller, posing as an individual named Peter Taschner, applied for a $10,000 unsecured loan with a Nationsbank branch office located in Washington, D.C. Because of mistakes in the application, the loan officer became suspicious and contacted the real Peter Taschner. Upon learning the real Taschner had not applied for a loan, the bank informed the Metropolitan Area Fraud Task Force (Task Force)[1] which arranged to be on the premises on the date the loan check was scheduled to be picked up.

On October 13, 1998 Miller, together with Jonathan Adeosun and Ayodele Hambolu, arrived at the bank in a black Toyota Camry. After the vehicle was parked briefly in an illegal space and circled the block once, Miller got out, entered the bank and met with the loan officer. A few minutes later, Adeosun also entered the bank and waited in line for a teller to make a deposit and get some change. While in the bank, Adeosun looked around continu-

---

1. The Task Force consists of agents from the United States Secret Service and the Federal Bureau of Investigation as well as local law enforcement officers.

ously but did not have any contact with Miller. After Miller completed his transaction, Task Force members placed both him and Adeosun under arrest.

In the meantime, outside the bank, other Task Force members learned of the arrests. Approaching the Camry where Hambolu was waiting, one of the Task Force members saw two "victim profiles"[2] (including one for Peter Taschner) on the center console. They then arrested Hambolu and searched the vehicle. In the glove compartment, Task Force members found a car rental agreement that listed Kayode as the lessee, provided her home address and named Adeosun, her husband, as an authorized driver. In the trunk they found a briefcase containing documents with names and biographical information about various people.

After the arrests, Miller admitted he was involved in bank fraud[3] and, pursuant to information obtained from him, Task Force members were able to recover other evidence located at a room in a Days Inn motel in the District. They also learned Adeosun's real identity (he had given them a false name when arrested) and reviewed information about Adeosun's activities provided by two confidential informants. Based on this information as well as the evidence seized from the Camry, the Task Force sought a warrant to search Adeosun's apartment, a storage unit next to his apartment and Kayode's car. Upon obtaining a signed warrant later that day, they began their search.

From the apartment and the storage unit the Task Force recovered hundreds of items, including a notebook containing approximately 500 individuals' personal profiles. Also recovered were Massachusetts and California driver's licenses in the name "Laura Black" and bearing Kayode's photograph; a New Jersey driver's license in the name "Sandra Foster" and bearing Kayode's photograph; as well as Neiman Marcus, Saks Fifth Avenue, World Perks and Macy's credit cards in the name "Sandra Foster." The Task Force also seized a Mercedes-Benz and a Toyota Camry both registered in Kayode's name.

How the Mercedes-Benz came to be registered in Kayode's name merits some discussion. According to the government, around September 18, 1998 Adeosun and Hambolu attempted without success to purchase a Mercedes-Benz at American Service Center in Virginia. On September 24, however, Adeosun—identifying himself as Joseph Cole—successfully negotiated the purchase of a 1999 Mercedes-Benz at Euro Motorcars in Bethesda, Maryland. He executed the purchase order in Kayode's name and gave the salesperson a $1000 cash deposit. The following day, after receiving credit for a trade-in vehicle, Adeosun and Kayode gave the dealership a $44,300 cashier's check drawn on Kayode's Citibank account and obtained possession of the vehicle.[4]

---

2. A victim profile was described at trial as a document containing identifying information about a person such as his name, Social Security number, address, date of birth, previous address, employer, annual income and nearest relative. Joint Appendix (JA) tab T at 360.

3. Miller later pleaded guilty to one count of bank fraud in violation of 18 U.S.C. § 1344 and agreed to testify for the government during the trial.

4. In order to cover the cashier's check, during the preceding two weeks, Kayode had made five cash deposits into her account. On September 11 Kayode made a $9500 deposit at the Reston, Virginia Citibank branch. On September 12 Kayode made two $9500 deposits at two Citibank branches in the District within a 90-minute period. On September 14 Kayode made an $8500 deposit at one of the District branches that was followed on September 24, 1998 by a $7300 deposit at the Reston branch.

## II.

On February 19, 1999 a federal grand jury returned an eight-count superseding indictment against Kayode, Adeosun, Hambolu and Miller. All of the defendants were charged with four counts of bank fraud and aiding and abetting as part of a scheme to defraud financial institutions in violation of 18 U.S.C. §§ 2, 1344 (counts one through four). Kayode, Adeosun and Hambolu were charged with one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (count five). Kayode and Adeosun were charged with one count of possession of false documents with intent to use unlawfully in violation of 18 U.S.C. § 1028(a)(3) (count seven). Finally, Kayode was charged with one count of structuring transactions to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(3) (count six) and one count of access device fraud in violation of 18 U.S.C. § 1029(a)(2) (count eight).

Kayode moved to suppress the evidence seized at her apartment and storage unit and to sever her trial from the other defendants and to sever some of the counts against her from others. Both motions were denied. *See United States v. Adeosun*, 49 F.Supp.2d 7 (D.D.C.1999), *aff'd*, 2000 WL 1838220 (D.C.Cir. Nov 13, 2000). Kayode renewed her motion for severance on the day of the trial. It was denied once again.

A jury trial began on July 12, 1999. Kayode pleaded not guilty to all charges. She testified that she rarely used the storage unit, that all the boxes had been placed there by Adeosun and that Miller also had a key to the unit and used it from time to time.

With regard to the false identification documents charge, she admitted that the California driver's license in the name of "Laura Black" was hers but denied having ever seen the Massachusetts driver's license in that name. Moreover, she claimed she had not seen the other identification documents and the credit cards in the name of "Sandra Foster" until the search of the apartment and the storage unit. Finally, she denied using any of the credit cards mentioned above or having posed for the "Sandra Foster" New Jersey driver's licence.

Testifying about the ownership of the Mercedes-Benz, Kayode maintained that the car was purchased for one of her husband's cousins, a certain Adelani. As a Nigerian businessman who was only visiting the United States, Adelani could not register the car in his own name and for that reason Adeosun asked Kayode to be the nominal owner for about one year, until the vehicle could be shipped to Nigeria. But, as far as Kayode knew, the money deposited in her account came from traveler's checks Adelani had cashed.

As already noted, Kayode was convicted on counts five through eight and acquitted on counts one through four.[5] On March 3, 2000 she was sentenced to thirty months' imprisonment followed by three years of supervised release. This appeal followed.

## III.

On appeal, Kayode raises six arguments: (1) she challenges the district court's denial of her motion to suppress the evidence uncovered from the search of the rental car; (2) she argues the district court erred in denying her misjoinder and severance motion; (3) she contends the district court erred in permitting a government "sum-

---

**5.** The jury convicted Adeosun on all accounts but was unable to reach a verdict as to Hambolu, with respect to whom the district court declared a mistrial.

mary witness" to characterize the evidence and to testify about evidence without first-hand knowledge ˙or a proper foundation; (4) she asserts the district court erred when it denied her motion for judgment of acquittal on counts seven (false identification documents) and eight (access device); (5) she finds fault with the district court's refusal to give the jury a unanimity instruction on count seven (false identification documents); and (6) she challenges the district court's sentencing conclusion that her case fell within the "heartland" of money laundering cases. We address each argument in turn.

.  A.  Suppression Motion

■  Before trial, Kayode moved to suppress the evidence found in the black Toyota after Hambolu's arrest. Because no probable cause existed to arrest Hambolu, she maintained, his arrest was unlawful; any evidence recovered from the Camry after the arrest was unlawfully obtained and should be excluded. The district court denied the motion concluding that there was probable cause for Hambolu's arrest and that the search of the passenger compartment of the vehicle was lawful as a search incident to arrest.[6]  *See Adeosun,* 49 F.Supp.2d at 11. Kayode contends this was error. Moreover, she argues that, because the warrant authorizing the search of the apartment and the storage unit was based upon evidence obtained from the Camry, any evidence recovered in the apartment and the storage unit should have been excluded. *See* Final Brief of Appellant at 20.

The government supports the district court decision on two independent grounds. First, Hambolu's arrest was supported by probable cause and therefore the subsequent search was valid as a search incident to a lawful arrest. Second, even if the district court was incorrect on that basis, the warrant authorizing the search of Kayode's apartment and storage unit was valid because independent grounds supported its issuance.

■  We agree with the government's first argument and need not reach the second. "We review the legal conclusion of probable cause *de novo,* the district court's findings of historical fact for clear error, and we give due weight to inferences drawn from the evidence by law enforcement officers and the district court." *United States v. Gilliam,* 167 F.3d 628, 633 (D.C.Cir.) (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Harrison,* 103 F.3d 986, 989 (D.C.Cir.1997)), *cert. denied,* 528 U.S. 845, 120 S.Ct. 118, 145 L.Ed.2d 100 (1999), *and cert. denied,* 526 U.S. 1164, 119 S.Ct. 2060, 144 L.Ed.2d 225 (1999). "Whether the police have probable cause for an arrest is determined by viewing the totality of the circumstances from the perspective of a prudent police officer and in light of the police officer's training and experience." *United States v. Catlett,* 97 F.3d 565, 573 (D.C.Cir.1996) (citing *Illinois v. Gates,* 462 U.S. 213, 230–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Probable cause exists if the arresting officer possesses information "sufficient to warrant a prudent man in believing that the [suspect has] committed or [is] committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *accord United States v. Lincoln,* 992 F.2d 356, 358 (D.C.Cir.1993) (per curiam). " 'Conduct

---

**6.**  The district court also found probable cause for the search of the trunk of the vehicle. Because Kayode does not appear to challenge that ruling, *see* Final Brief of Appellant at 15– 20, we limit our discussion to the search of the passenger compartment. *See Adeosun,* 49 F.Supp.2d at 12–13.

which appears innocent to a lay person may have entirely different significance to an experienced ... officer.' " *Catlett,* 97 F.3d at 573 (quoting *United States v. Hicks,* 752 F.2d 379, 384 (9th Cir.1985)). "Moreover, 'a combination of factors may establish probable cause even if each factor standing alone is insufficient.' " *Id.* (quoting *United States v. Halliman,* 923 F.2d 873, 881 (D.C.Cir.1991)).

At the first suppression hearing, Special Agent Brendan Pickett of the United States Secret Service testified that a Task Force member saw a victim profile for Peter Taschner in plain view when he first approached the Camry. The arresting Task Force members were aware of the activities going on inside the bank and knew of the name Peter Taschner. Based on this information, and the fact that Miller and Adeosun had arrived at the bank in the car driven by Hambolu, they concluded Hambolu was involved in criminal activity and arrested him. The district court credited Pickett's testimony. In our view, the district court did not clearly err in its factual findings and correctly concluded that there was probable cause for Hambolu's arrest. Furthermore, because the passenger compartment search was incident to a lawful arrest, the evidence recovered therefrom was lawfully obtained. Accordingly, the district court did not err in denying Kayode's motion to suppress evidence recovered from her apartment and storage unit.

### B. Motion to Sever Defendants

On the morning of the trial, Kayode renewed her attempt to have the district court sever her trial from that of Adeosun. Her lawyer informed the court that Adeosun could provide testimony favorable to his client and that, according to Adeosun's counsel, "it [was] not likely that Mr. Adeosun [was] going to be testifying." JA tab T at 210. The district court denied the motion. Kayode now challenges that decision.

■ Under Rule 14 of the Federal Rules of Criminal Procedure, a district court may grant a motion to sever "[i]f it appears that a defendant ... is prejudiced by a joinder of ... defendants." Fed. R.Crim.P. 14; *see United States v. Washington,* 12 F.3d 1128, 1133 (D.C.Cir.), *cert. denied,* 513 U.S. 828, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994). Because of the permissive language of Rule 14, "we accord great deference to a district court's decision to deny severance." *Washington,* 12 F.3d at 1133 (citing *United States v. Harrison,* 931 F.2d 65, 67 (D.C.Cir.), *cert. denied,* 502 U.S. 953, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991)).

■ In *United States v. Ford,* 870 F.2d 729 (D.C.Cir.1989), the court set forth "four preconditions necessary for a movant to establish a *prima facie* case for severance based on an asserted need for a co-defendant's testimony." *Washington,* 12 F.3d at 1133. The movant must show "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed." *Ford,* 870 F.2d at 731; *accord Washington,* 12 F.3d at 1133. "A failure to demonstrate any one of these elements is dispositive." *Washington,* 12 F.3d at 1133 (citing *Harrison,* 931 F.2d at 67). "Once the movant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion." *Ford,* 870 F.2d at 731 (citations omitted). In this balancing anal-

ysis, the court also considers "the extent to which proffered exculpatory testimony could be impeached." *Id.* at 732–33.

■ Kayode argues the district court correctly found her proffer sufficient to satisfy the threshold showing required by *Ford* but abused its discretion when it failed to carry out the four-factor balancing analysis. The government responds that the district court merely assumed, but did not decide, that Kayode had made the threshold showing but, in any event, the court did carry out the appropriate balancing analysis and concluded the four factors weighed against severance.

Ruling on Kayode's request, the district court stated:

> I'm not sure I can evaluate the likelihood that the codefendant would actually give this testimony if the cases were severed. And most important, in the context of the case pretrial before other testimony has been received, I am not really in a position to rule on whether there is a bona fide need for the testimony. Assuming for the sake of the discussion that the prima facie case outlined in United States versus Ford has been proffered, I have to find at this point that the significance of the testimony, the extent of prejudice without the testimony, are [sic] unclear. The effect on judicial administration and economy are [sic] negative, and I've said I won't rule on the basis of the timeliness of the motion, and I won't, but they certainly come late.

JA tab T at 235. The record plainly manifests the district court performed the required balancing analysis and, in our view, did not abuse its discretion in denying Kayode's request. As the district court concluded, the interest in judicial economy militated against severance, especially in view of the fact that the renewed motion was made on the morning of the trial. Accordingly, the district court's ruling stands.[7]

## C. Summary Witness

■ At the trial, the government relied on Pickett to testify both as a fact witness and as a "summary witness."[8] As a summary witness, he identified a number of documents found in the apartment or storage unit and often referred to those documents using law enforcement terms like "templates" or "phone scripts." Kayode challenges the district court's decision to allow Pickett's testimony on two grounds. First, she argues the testimony consisted of speculation as to the significance and the characterization of exhibits, allowing the government in effect to present two closing arguments. Second, Pickett's testimony about the location from which the exhibits were seized was inadmissible hearsay because Pickett himself did not seize all of the evidence and he did not have personal knowledge of the location where each exhibit was found (*i.e.*, the apartment or the storage unit). Moreover, later in the trial, the government failed to establish a foundation for the exhibits Pickett introduced.

---

7. Because of our disposition of this issue, we need not resolve whether Kayode's proffer met the threshold showing required under *Ford.*

8. Rule 1006 of the Federal Rules of Evidence provides:
   The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.
   Fed.R.Evid. 1006.

As to the characterization argument, the government counters that Kayode made no specific objection at trial and therefore review should be for plain error only. We agree. Despite the assistance of the district court, JA tab T. at 488–90, Kayode never objected to Pickett's use of law enforcement terms. Nor did she timely object to the testimony as a whole. Pickett's use of the terms "templates" and "phone scripts" did not invade the province of the jury and on this record we find no plain error.[9]

■ As to the hearsay and foundation issues, although we agree with Kayode that the government failed to provide a proper foundation to introduce the exhibits because Pickett had no firsthand knowledge of the exact location from which they were seized and subsequent government witnesses failed to fill this gap, see United States· v. Lemire, 720 F.2d 1327, 1349 (D.C.Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984), we nonetheless conclude the error was harmless. See United States v. Williams, 212 F.3d 1305, 1310 (D.C.Cir.2000) (summarizing our standard of review). Regardless whether the documents were all found in the storage unit, the driver's license bearing Kayode's picture and the name "Sandra Foster" is overwhelming evidence of her complicity in the criminal scheme. There is no plausible alternative explanation: indeed, to find otherwise, the jury would have had to believe that Adeosun appropriated Kayode's picture and then obtained the driver's license by forgery. Yet Kayode made no claim that the license was a forgery. On this record, in light of the overwhelming evidence of Kayode's violation of 18 U.S.C. § 1029(a)(2), see infra pages 12–13, we conclude the district court's error was harmless.

### D. Motion for Judgment of Acquittal

#### 1. Count Eight (Access Device Fraud)

■ At the end of the trial, Kayode moved for judgment of acquittal on count eight arguing the government failed to present sufficient evidence to support a conviction for access device fraud.[10] The district court denied the motion and Kayode now challenges that decision.

■ "We review a trial court's denial of [a motion for judgment of acquittal] de novo, considering the evidence in the light most favorable to the government and determining whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." United States v. Harrington, 108 F.3d 1460, 1464 (D.C.Cir.1997) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); United States v. Lucas, 67 F.3d 956, 959 (D.C.Cir.1995)). Here, the government presented overwhelming evidence of Kayode's guilt, including the following items found in the

---

9. We are not persuaded by Kayode's argument that Pickett's testimony about the "significance" of the exhibits was in essence an extra closing argument. His testimony on this point was merely attempting to show, albeit awkwardly, how the numerous exhibits were related to each other, an appropriate function of a "summary" witness. See United States v. Lemire, 720 F.2d 1327, 1348 (D.C.Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

10. 18 U.S.C. § 1029(a)(2) provides "Whoever ... knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period ... shall, if the offense affects interstate or foreign commerce, be punished [as provided in another subsection of the statute]." The statute defines "access devices" to include credit cards. See 18 U.S.C. § 1029(e)(1).

storage unit: (1) four handwritten sheets containing biographical information about Sandra M. Foster, (2) a New Jersey driver's license in the name of Sandra Foster bearing a picture of the defendant, (3) credit cards in the name of Sandra M. Foster, (4) an account statement in the name of Sandra Foster from Macy's, (5) a receipt from Neiman Marcus and an accompanying credit card application in the name of Sandra Foster and (6) a confirmation of a CompUSA credit card in the name of Sandra Foster as well as a CompUSA receipt. The government also showed that the Nieman Marcus credit card was obtained through the use of a New Jersey driver's license and Visa card for identification. Finally, the government established that the credit cards were used to obtain items having an aggregate value of $1000 or more during a one year period. Based on these facts, the jury could rationally find each element of the crime beyond reasonable doubt. We accordingly conclude that, "considering the evidence in the light most favorable to the government," the evidence "is sufficient to permit a rational trier of fact to find all· of the essential elements of the crime beyond a reasonable doubt," *Harrington*, 108 F.3d at 1464, and the district court did not error in denying Kayode's motion for judgment of acquittal on count eight.

### 2. Count Seven (Five False Identification Cards)

■ Kayode also sought judgment of acquittal on count seven. The district court denied her motion and again she appeals.

18 U.S.C. § 1028(a)(3) prohibits "knowingly possess[ing] with intent to use unlawfully ... five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents," 18 U.S.C. § 1028(a)(3), when the possession "is in or affects interstate or foreign commerce." *Id.* § 1028(c). Kayode contends the government failed to prove that she had "an intent to use [the identifications] unlawfully." *See* Final Brief of Appellant at 35. She argues the government was required to demonstrate that one or more of the intended uses was unlawful and to point out what federal, state or local law would be violated through the particular use. Kayode's argument relies on *United States v. Rohn*, 964 F.2d 310 (4th Cir.1992).

We find Kayode's reliance on *Rohn* misplaced. As the government correctly points, unlike *Rohn*—where the sole charge against the defendant was the violation of 18 U.S.C. § 1028(a)(3) and where the jury was not instructed on how the defendant's intended use of the false identifications would violate the law—here Kayode was concurrently charged with, and tried before the jury on, an intended unlawful use of the false identification, namely access device fraud. Thus, the jury was adequately informed both of "the uses to which appellant intended to put the identifications" and that the "intended uses would violate one or more federal ... laws." *Rohn*, 964 F.2d at 313. Moreover, as already discussed, evidence of her access device fraud was compelling, thus more than adequately grounding her conviction. *See Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Accordingly, the district court's ruling on the motion for acquittal on count seven stands.

### E. Unanimity Instruction

■ Kayode argues the district court erred in denying her request for a unanimity instruction. The argument runs as follows. She was charged with the possession of false identification documents with the intent to use them unlawfully. *See* 18

U.S.C. § 1028(a)(3). The statute makes unlawful the possession of *five* or more false documents. In order to convict, the jury must find as to each identification document that the document was false, that the defendant possessed it and that the defendant intended to use that document unlawfully. Here, the jury heard evidence about more than five identification documents and Kayode offered different defenses with respect to each. Thus, she asserts, the district court should have given a unanimity instruction requiring all members of the jury to agree as to which five documents satisfied all elements of the statute.

█ We review the denial of a requested jury instruction *de novo*. *See United States v. Dickerson*, 163 F.3d 639, 641 n. 3 (D.C.Cir.1999) (citing *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C.Cir.1993)). The government ·concedes that Kayode requested the instruction at issue, *see* Final Brief for Appellee at 42, but argues that the Sixth Amendment does not require the jury to agree unanimously on which five false identification documents Kayode possessed with intent to use unlawfully. And, in any event, any error in failing to give the instruction was harmless. We agree ·with the government's first proposition and need not reach the second.

In *United States v. Harris*, 959 F.2d 246 (D.C.Cir.) (per curiam), *cert. denied*, 506 U.S. 932, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992), the defendant was convicted of engaging in a continuing criminal enterprise (CCE), a crime requiring action "in concert with five or more other persons." 21 U.S.C. § 848(c). The district court there instructed the jury that it must unanimously agree on which five (or more) persons belonged to the enterprise. *See Harris*, 959 F.2d at 254. The government appealed arguing that neither the CCE statute nor the Sixth Amendment required such particularized agreement among jurors. We agreed. Relying on *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), we concluded that all the jury was required to agree on was that the defendant had committed the offense as defined in the statute, not how the defendant had done so. *See Harris*, 959 F.2d at 255 ("Because each member of the jury found that Palmer had acted in concert with 'five or more persons,' the jury unanimously agreed that he had committed the offense as Congress defined it."). The reasoning of *Harris* is applicable here as well. The statute makes relevant only the number of false identification documents intended to be used, not the identity of each particular document. The district court therefore did not err in declining to give a unanimity instruction.

F. Sentencing

█ Finally, Kayode argues the district court erred in refusing to grant a downward departure in sentencing her. As the Supreme Court explained in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), when reviewing sentencing departure decisions, "in most cases" we owe the district court "substantial deference." *Id.* at 98, 116 S.Ct. 2035; *accord United States v. Bridges*, 175 F.3d 1062, 1065 (D.C.Cir.1999). "We must uphold a district court's findings of fact unless clearly erroneous[ ] and must give due deference to its application of the Guidelines to the facts." *Bridges*, 175 F.3d at 1069 (citing *Koon*, 518 U.S. at 97, 116 S.Ct. 2035 (citing 18 U.S.C. § 3742(e)); *United States v. Dozier*, 162 F.3d 120, 123 (D.C.Cir.1998)). But, when a district court makes an error of law, it " 'by definition abuses its discretion' " and we " 'need not defer to the district court's resolution' " of such legal issues. *Id.* (quoting *Koon*, 518

U.S. at 100, 116 S.Ct. 2035). Rather, "our review of questions of law is *de novo.*" *Id.* (citing *United States v. Becraft,* 117 F.3d 1450, 1451 (D.C.Cir.1997)).

■ A district court makes a mistake of law, *inter alia,* "when it misconstrues the language of a guideline and consequently mischaracterizes the boundaries of the heartland created by the guideline." *United States v. Jaderany,* 221 F.3d 989, 995 (7th Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 1095, 148 L.Ed.2d 968 (2001); *see also United States v. Rivera,* 994 F.2d 942, 951 (1st Cir.1993) ("Plenary review is . . . appropriate where the appellate court, in deciding whether the allegedly special circumstances are of a 'kind' that permits departure, will have to perform the 'quintessentially legal function' of interpreting a set of words, those of an individual guideline, in light of their intention or purpose, in order to identify the nature of the guideline's 'heartland' (to see if the allegedly special circumstance falls within it)." (citations omitted)); *United States v. Collins,* 122 F.3d 1297, 1303 n. 4 (10th Cir.1997) (review of determination of guideline's heartland not deferential because inquiry is legal in nature; (citing *Rivera,* 994 F.2d at 951)).

■ Kayode's sentencing argument essentially challenges the district court's interpretation of the "heartland" of section 2S1.2 of the United States Sentencing Guidelines (Guidelines), under which she was sentenced.[11] She contends section 2S1.2 applies only when a defendant knowingly launders large sums of money from drug trafficking or serious organized crime. Because this case involved neither drug nor organized crime proceeds, it was "atypical" within the meaning of Appendix A (as it existed at her sentencing) and, she continues, the district court should have computed her sentence under the fraud or money structuring guideline instead. *See* U.S.S.G. §§ 2F1.1, 2S1.3. Reviewing *de novo,* we find no error in the district court's refusal to depart.[12]

At the time of Kayode's sentencing, the Statutory Index (Appendix A) to the Guidelines explained that "[t]his index specifies the guideline section or sections ordinarily applicable to the statute of conviction." U.S.S.G.App. A, intro. comment.

---

**11.** In relevant part, U.S.S.G. § 2S1.2 provides:

> Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity
> (a) Base Offense Level: 17

Because Kayode was sentenced in 1998, all references are to the 1998 version of the Guidelines unless otherwise noted.

**12.** Because we find Kayode's argument unpersuasive under the 1998 version of the Guidelines, we need not consider the effect of Amendment 591 to the Guidelines, U.S.S.G.App. C, amend. 591, effective November 1, 2000, which changes the introduction to the Statutory Index (Appendix A) and makes Kayode's position even more untenable. *See also United States v. Diaz,* 245 F.3d 294, 301 (3d Cir.2001) (highlighting changes). *Compare United States v. Smith,* 186 F.3d 290

(3d Cir.1999) (concluding that guidelines require sentencing court to perform heartland analysis in making initial choice of appropriate guideline to apply in order to determine whether conduct being punished falls within set of typical cases embodying conduct described in each guideline) *with United States v. Mustafa,* 238 F.3d 485, 496 (3d Cir.2001) (recognizing that Amendment 591 "directs the sentencing court to focus on the offense of conviction and apply the 'applicable' guideline as determined by the Statutory Index in Appendix A without conducting the heartland analysis we required under *Smith*") and *Diaz,* 245 F.3d at 302 ("The amendment reflects a change from the permissive to the mandatory. The sentencing court no longer uses the Statutory Index (Appendix A) as an aid in finding the most applicable guideline among several possibilities; the Statutory Index (Appendix A) now conclusively points the court to the one guideline applicable in a given case.").

The Statutory Index (Appendix A) also directed that "[i]f, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved" the sentencing court should "use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." *Id.*

Kayode was convicted of violating 18 U.S.C. § 1956(h) which provides that a conspiracy to commit the offenses defined in 18 U.S.C. § 1957 is subject to the same penalties as the completed offense. The Statutory Index (Appendix A) provides that U.S.S.G. § 2S1.2 applies to a defendant convicted of violating 18 U.S.C. § 1957.[13] Section 2S1.2 is entitled "Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity" and establishes an offense level of 17. Application note 1 explains that "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) and includes *inter alia* racketeering offenses. *See* U.S.S.G. § 2S1.2, comment. (n.1). 18 U.S.C.

§ 1961(1), in turn, defines "racketeering activity" to include an act indictable under 18 U.S.C. § 1344 (relating to financial institution fraud).

In our view, this case falls within the heartland outlined in U.S.S.G. § 2S1.2. Kayode engaged in monetary transactions involving property derived from defrauding federally insured financial institutions. On five separate occasions, she deposited fraudulently obtained funds in her bank account. She then used a certified check to withdraw the deposited funds and purchase a vehicle registered in her name. The plain language of section 2S1.2 includes her activity within its scope and we are not persuaded the money laundering guideline covers only proceeds from drug or organized crimes. *See United States v. Ford,* 184 F.3d 566, 587–88 (6th Cir.1999) (affirming refusal to depart from section 2S1.2; gambling within section 2S1.2 heartland because commentary to section expressly refers to 18 U.S.C. § 1961(1) which includes gambling as indictable offense; fact that proceeds did not come

---

**13.** Section 1957 provides in relevant part:
Engaging in monetary transactions in property derived from specified unlawful activity
(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
. . .
(c) In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.
(d) The circumstances referred to in subsection (a) are—
(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States . . .
. . .

(f) As used in this section—
(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;
(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and
(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

from drugs or organized crime by itself not sufficient to take offense out of heartland), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000); *see also United States v. Prince,* 214 F.3d 740, 768–69 (6th Cir.) (application of § 2S1.1 proper where defendants attempted to conceal proceeds of wire fraud), *cert. denied,* 531 U.S. 974, 121 S.Ct. 417, 148 L.Ed.2d 322 (2000); *United States v. Adams,* 74 F.3d 1093, 1102 (11th Cir.1996) ("We agree with our colleagues in the First and Eighth Circuits that Congress intended to criminalize a broad array of money laundering activity," including laundering of misapplied funds belonging to Resolution Trust Corporation and district court erred when it departed from section 2S1.1 on ground that case before it did not involve "classic money laundering."); *United States v. Le-Blanc,* 24 F.3d 340, 346–47 (1st Cir.) (error not to sentence depositor of gambling proceeds under money laundering guidelines since section 1956 covers broader array of crimes than "classic money laundering" involving drug proceeds), *cert. denied,* 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994); *United States v. Morris,* 18 F.3d 562, 569 (8th Cir.1994) (remanding for re-sentencing after district court failed to apply U.S.S.G. § 2S1.1 to defendant who committed bank fraud and who for purpose of concealment transferred proceeds of bank fraud into separate account; noting that Congress intended cumulative punishment for unspecified unlawful activities). *But see United States v. Woods,* 159 F.3d 1132, 1134–37 (8th Cir.1998) (affirming departures based in part on fact that underlying offenses, although literally within statute, were not drug-trafficking, "organized crime," "serious money-laundering," or "unusually severe fraud"); *United States v. Hemmingson,* 157 F.3d 347, 361–63 (5th Cir.1998) (same). We therefore hold that the offense of money laundering arising from a violation of 18 U.S.C. § 1344 falls within the heartland of section 2S1.2 and the district court did not err in refusing to depart downward.

## IV.

For the foregoing reasons, the district court's judgment is

*Affirmed.*