[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 7, 2005
THOMAS K. KAHN
CLERK

No. 04-10663
Non-Argument Calendar
_____

D.C. Docket No. 03-80075-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL KLOPF,
a.k.a. Michael James,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 7, 2005)

Before ANDERSON, BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

Michael Klopf, proceeding pro se, appeals his convictions and sentence for identity theft involving fraudulent driver's licenses, in violation of 18 U.S.C. § 1028(a)(3) (2000), and credit cards, in violation of 18 U.S.C. § 1029(a)(2). We affirm Klopf's convictions for unlawful use of identification documents and clarify the intent element necessary for proving a violation of § 1028(a)(3) as well as the effect on interstate or foreign commerce required for conviction under both statutes. Because Klopf's sentence for conviction under § 1028(a)(3) exceeds the statutory maximum, we vacate his sentence in its entirety and remand for resentencing.

## I. BACKGROUND

Klopf was indicted for violating 18 U.S.C. § 1028(a)(3), possessing with intent to use unlawfully five or more fraudulent identification documents, ("Count I"), and 18 U.S.C. § 1029(a)(2), using unauthorized access devices with the intent to defraud, ("Count II"). The fraudulent identification documents consisted of approximately sixteen Florida driver's licenses bearing Klopf's picture alongside identifying information for several other individuals, while the access devices were credit cards in the names of individuals identified as A.G., M.E.H., R.J.A.,

2

and G.S.Z. These individuals were later identified as Allen Gould, Martin

Hanaka, Robert J. Adamson, and Gary Zack, respectively.

At trial,[1] Barry Golden, of the United States Marshal's Service, testified

that, at the time when Klopf was arrested, he searched Klopf's vehicle and

recovered (1) a credit card purportedly issued to Martin Hanaka of United Equity

Leasing Service, (2) a printout from a public records database with identifying

information for Hanaka, including address, Social Security number, birth date, and

driver's license number, (3) a Visa credit card issued by Bank One to Gary Zack of

Integrated Data Concepts, (4) a printout of identifying information for Zack, (5) a

MasterCard credit card issued by Advanta Bank to Robert J. Adamson of United

Equity Leasing Service, and (6) a printout of identifying information for Adamson.

Golden further testified that, at the time of his arrest, Klopf was living in an

apartment that he had rented under the name of Garrett Bender. During a search of

Klopf's apartment, Golden observed a number of plastic storage containers. In

these containers were folders, which held identifying information and various

documents pertaining to several individuals, including Bender, Gould, Hanaka,

Zack, Joseph Rebak, Scott Woolley, Steven Sponder, Michael Becker, Michael

Wertheimer, and Michael Hoover. Golden also testified that he recovered a

---

[1] At trial, Klopf represented himself pro se with the assistance of stand-by counsel.

package, addressed to Robert J. Adamson, that was delivered to a Storage USA facility, where Klopf had rented storage and office space under the name of "Garrett." Additionally, the government introduced into evidence Klopf's Storage USA application, which indicated that he had rented the facility under the name of Bender, using Bender's driver's license number.[2]

Zack, president of Engineer Glass Systems, testified that he did not know Klopf and never allowed Klopf to use his identity. R5 at 194. Zack testified that he was not affiliated with a company named Integrated Data Concepts and did not apply for the Bank One credit card that was found in Klopf's possession. When shown a $4,500 check that was purportedly written by him, he testified that the signature on the check was not his. Id. at 198. Hanaka, chairman of the board of Sports Authority, likewise testified that he never allowed Klopf to use his identity to apply for credit cards. Id. at 201. He testified that he was not associated with United Equity and Leasing Service and had never applied for the Capital One credit card that was discovered in Klopf's possession.

Leo Johnson testified that he had made several fraudulent Florida driver's licenses at Klopf's request. Id. at 214. Johnson testified that, although the

---

[2] Although the application is not included in the record, both parties agree concerning the substance of the information entered on the application.

fraudulent driver's licenses were not perfect replicas of actual Florida licenses, they were passable to an untrained person. Johnson stated that these fraudulent driver's licenses exhibited Klopf's picture and identifying information for other individuals, which was obtained from a public records database. Johnson testified that the licenses contained the actual Florida driver's license numbers for the identified individuals. Johnson also provided Klopf with fraudulent supporting documents, including Social Security cards, voter registration cards, utility bills, and American Express credit cards. The purpose of the supporting documentation was to "add[] value and weight" to the fraudulent driver's licenses. Id. at 230. Johnson testified that Klopf purchased approximately thirty sets of documentation and requested the supporting documents in order to obtain a "full wallet" of identifying documents for the same individual. Id. at 243.

Kelly Carrick, of the Florida Highway Patrol Bureau of Investigation's Driver's License Fraud Task Force, testified as an expert in the detection of fraudulent Florida driver's licenses. Trooper Carrick testified that the driver's licenses found in Klopf's apartment contained identifying information for Woolley, Bender, Rebak, Hoover, Becker, David Ruttenberg, Steven Sponder, and Brad McBride. Id. at 254-63. When she checked the information from the licenses against the information contained in the Florida Highway Patrol's

5

database, she discovered that the pictures and certain information did not match, and, therefore, concluded that the licenses were fraudulent.

On cross-examination, Trooper Carrick testified that (1) none of the fraudulent driver's licenses contained the holograms that appear on valid Florida driver's licenses; (2) the magnetic stripes were not encoded with the appropriate identifying information; and (3) each contained several other defects that indicated that they were not valid licenses. Trooper Carrick further testified that the licenses were poor replicas and that she had "seen a lot better." Id. at 274. She testified, however, that an untrained officer might not recognize the driver's licenses as fraudulent, especially considering the fact that the hologram on a valid Florida license can potentially erode. On redirect, Trooper Carrick testified that the average lay person would believe that the fraudulent driver's licenses were valid Florida driver's licenses.

Clayton Wariner, of Advanta Bank Corporation, testified that (1) the credit card bearing Adamson's name was a valid card issued by Advanta; (2) the Adamson account had a credit limit of $12,500, and $10,733.74, less finance charges, had been charged to the account; and (3) the Adamson account was closed and written off as a fraud loss. Id. at 286-94. Wariner additionally testified that a credit card bearing Gould's name was a valid card issued by Advanta. He

6

stated that Advanta incurred a total loss of $14,431.25 as a result of charges made on the Gould account.  Id. at 300.  He testified that Advanta's account statements are processed in, and mailed from, Nebraska.  On cross-examination, Wariner testified that the Adamson and Gould accounts were not closed until Advanta was contacted by United States Marshals, who informed them that the accounts had been implicated in a fraud investigation.  Id. at 306-08.  Wariner testified that the Adamson account was delinquent at that time, but the Gould account was not.

Leslie Godden, of Bank One, testified that approximately $9,161.76 in charges were made using the credit card issued in Zack's name.  Id. at 325.  On cross-examination, Godden testified that the Zack account was closed in March 2003 because it was deemed to be fraudulent following notification by United States Marshals.  Gould testified that he had never given Klopf permission to use his identifying information in order to obtain a credit card.  Id. at 335.  Elaine Kolar, a teller at the Wachovia bank located near Klopf's apartment, testified that three ATM withdrawals were made at her bank using the Gould credit card.

William Schulz, of the United States Secret Service, testified that several of the credit cards found in Klopf's possession were used on numerous occasions at Mark's Chop House in Jupiter, Florida.  Id. at 361-62.  Schulz testified that he visited Mark's Chop House and spoke with its owner, Mark Bendeck.

7

Subsequently, Bendeck testified that Schulz showed him a series of photographs and asked if he recognized any of the individuals. Bedeck stated that he recognized one of the individuals pictured as a person, whom he knew as Allen, then later as Gary, who had visited the restaurant eight to twelve times. R6 at 387. Bendeck testified that Mark's Chop House is located two to three miles from Klopf's apartment.

At the close of the government's case-in-chief, Klopf moved for a judgment of acquittal and argued that, (1) with regard to Count I, the government failed to prove that he intended to use the fraudulent identification documents for an unlawful purpose; and, (2) with regard to Count II, the government failed to prove that he used unauthorized access devices with the intent to defraud. The district judge denied his motion. The only evidence presented by Klopf in his defense was a stipulation that the Hanaka credit card account was open as of February 14, 2003, the date of Klopf's arrest, with a payment due on March 11, 2003. Id. at 421. Klopf then renewed his motion for judgment of acquittal, which was denied.

Klopf requested a jury instruction informing the jurors that, to find him guilty on Count I, they must identify and name a specific offense that he intended to commit with the fraudulent identification documents in his possession. Klopf contended that the government could not prove that he intended to use the

fraudulent identification documents unlawfully without identifying a specific law that his intended use would have violated. The district judge denied the request and found that our circuit's pattern jury instruction for a violation of § 1028(a)(3) was sufficient.

In his closing argument, Klopf maintained that possessing a counterfeit driver's license is not illegal unless there is a corresponding intent to use it unlawfully. Klopf argued that the government failed to prove that he intended to use the fraudulent identification documents at all, much less for an unlawful purpose. The jury returned a guilty verdict for Klopf on both counts.

In the presentence investigation report ("PSI"), the probation officer grouped Klopf's offenses together and set the base offense level at 6, pursuant to U.S.S.G. § 2B1.1(a) (2003). The probation officer added the following enhancements to the base offense level: (1) a ten-level enhancement under § 2B1.1(b)(1)(F), because the amount of the loss was between $120,000 and $200,000; (2) a two-level enhancement under § 2B1.1(b)(8)(C), because the offense involved the use of sophisticated means; (3) a two-level enhancement under § 2B1.1(b)(9)(C)(ii), because the offense involved "the possession of five or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification"; (4) a four-level enhancement under

U.S.S.G. § 3B1.1(a), because Klopf was the leader or organizer of a criminal enterprise involving five or more participants; and (5) a two-level enhancement under U.S.S.G. § 3C1.1, for obstruction of justice. With a total offense level of 26, and a criminal history category of VI, Klopf's Sentencing Guidelines range was 120 to 150 months of imprisonment. The PSI states that the maximum statutory sentence authorized was fifteen years for Count I and ten years for Count II.

The PSI also shows that, under 18 U.S.C. §§ 3583(a) and (b)(2), the sentencing court was permitted to impose a term of supervised release of up to three years. Under U.S.S.G. § 5D1.1(a), however, the judge was required to order supervised release for not more than three years if he imposed a term of imprisonment of more than one year. The PSI also states that Klopf was required to pay restitution to the victims under 18 U.S.C. § 3663A(a)(1) and that the total restitution owed was $104,865.14.

Klopf objected to all of the sentencing enhancements and argued that they were unlawful, under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), because they increased his sentence based on facts stated in the PSI, which were neither admitted by him nor proved to the jury. At the sentencing hearing, the district judge overruled this objection. The government moved for an upward

departure, which the judge reluctantly denied because he concluded that nothing in Klopf's case rendered it outside of the heartland for identity theft cases. The judge further stated that he would have granted an upward departure, if he had been permitted to do so because he believed that Klopf deserved the harshest sentence available. The judge sentenced Klopf to concurrent sentences of 150 months of imprisonment on Count I, and 120 months of imprisonment on Count II. Additionally, the judge imposed a three-year term of supervised release and ordered Klopf to pay $104,865.14 in restitution. On appeal, Klopf challenges his convictions and sentence.

## II. DISCUSSION

### A. Conviction for Possession of Fraudulent Identification Documents

Klopf argues that the government failed to prove (1) that he intended to use the sixteen fraudulent Florida driver's licenses found in his possession for an unlawful purpose, or (2) that his possession of those licenses had any affect on interstate or foreign commerce. Klopf contends that a conviction under § 1028(a)(3) requires proof that (1) his intended use of the fraudulent identification documents[3] "violated a particular federal, state, or local law," and

---

[3] An "identification document," such as a driver's license, is defined by the statute:

[T]he term "identification document" means a document made or issued by

11

(2) his "actual use" of the fraudulent identification documents affected interstate or foreign commerce. Appellant's Br. at 19. He argues that the government failed to prove either of these elements. Specifically, Klopf contends that, because the government failed to prove that he ever used fraudulent identification documents in any manner, it could not possibly have proven that his actual use of the fraudulent driver's licenses affected interstate or foreign commerce.

We review a defendant's challenge to sufficiency of the evidence de novo. United States v. Hunt, 187 F.3d 1269, 1270 (11th Cir. 1999) (per curiam). "The evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979)). "In determining whether sufficient evidence supports a defendant's conviction, we view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict."

---

or under the authority of the United States Government, a State, political subdivision of a State, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals[.]

18 U.S.C. § 1028(d)(2).

12

United States v. Chirinos, 112 F.3d 1089, 1095 (11th Cir. 1997). Where the

government relies on circumstantial evidence, "reasonable inferences, and not

mere speculation, must support the jury's verdict." United States v. Perez-Tosta,

36 F.3d 1552, 1557 (11th Cir. 1994).

To convict a defendant for possession with intent to use unlawfully five or

more false identification documents, in violation of § 1028(a)(3), the government

must prove three elements: "(1) the defendant knowingly possessed five or more

false identification documents, (2) the defendant had the willful intent to transfer

the false identification documents unlawfully, and (3) the defendant's possession

of the false identification documents was in or affecting interstate commerce."[4]

---

[4] The relevant statutes comprising this three-part proof by the government operate in conjunction:

(a) Whoever, in a circumstance described in subsection (c) of this section—
. . . .
(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents;
. . . .
shall be punished as provided in subsection (b) of this section.
. . . .
(c) The circumstance referred to in subsection (a) of this section is that—
. . . .
(3) either—
(A) the production, transfer, possession, or the use prohibited by this section is in or affects interstate or foreign commerce . . . .

18 U.S.C. §§ 1028(a)(3), (c)(3)(A).

13

United States v. Alejandro, 118 F.3d 1518, 1521 (11th Cir. 1997); 18 U.S.C. §§ 1028(a)(3), (c)(3)(A).

Klopf concedes that the government proved the first element of the offense, but he challenges the other two elements. With regard to the second element, the evidence presented at trial demonstrated that (1) Klopf possessed valid credit cards in the names of several individuals, who had not given him permission to use their information, and had charged over $30,000 to those accounts; (2) he possessed sixteen fraudulent Florida driver's licenses, with supporting documentation that bore his picture and the identifying information of other individuals; (3) although the names on the driver's licenses did not match the names on the credit cards, identifying information and documents pertaining to the individuals named on the credit cards were found in plastic containers in Klopf's apartment, along with information relating to the individuals named on the driver's licenses; and (4) he had requested and obtained fraudulent supporting documentation for the individuals named on the driver's licenses, in order to create a "full wallet" of identifying documents purporting to belong to the same individual. Based on this evidence, a reasonable factfinder could infer that Klopf intended to obtain valid credit cards bearing the same names as those on the driver's licenses, and, if he

was ever questioned about his identity while attempting to use one of the credit cards, he could then use his fraudulent driver's license to verify that he was the individual named on the credit card. Such use would be unlawful, because it would violate 18 U.S.C. § 1029(a)(2) concerning fraud related to access devices. Accordingly, sufficient evidence supported the jury's finding that Klopf intended to use the fraudulent identification documents for an unlawful purpose.

Concerning the third element, the effect on interstate or foreign commerce, the following facts were proved at trial: (1) Klopf rented a storage facility under the name Bender; (2) Klopf possessed two fraudulent driver's licenses bearing Bender's name and identifying information; (3) the number on the driver's license matched the number entered on the application for the storage facility; and (4) Klopf used the storage facility to receive mail, including unauthorized credit cards and account statements. Given these facts, a reasonable factfinder could infer that Klopf used one of the fraudulent identification documents to verify his identity when applying for the storage facility, and, in turn, used that facility to receive mail in connection with a credit card scheme that had a significant effect on interstate commerce. Because it would be reasonable for a factfinder to make this inference, sufficient evidence supports Klopf's conviction for Count I as to the second element of proof. See Perez-Tosta, 36 F.3d at 1557.

Under 18 U.S.C. § 1028(c)(3)(A), "[t]he circumstance referred to in subsection (a) of this section is that . . . the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce." Id. In reviewing the legislative history for this statute, the Fourth Circuit noted "that Congress intended 'to provide broad Federal jurisdiction over violations of this section' by requiring that only a 'minimal nexus with interstate or foreign commerce be shown.'" United States v. Pearce, 65 F.3d 22, 25 (4th Cir. 1995) (quoting H.R. Rep. No. 802, 97th Cong., 2d Sess. 1 (1982), reprinted in, 1982 U.S.C.C.A.N. 3519, 3532-33). By requiring the government to prove a minimal connection to interstate commerce in a § 1028(a) case, this statue, in contrast to those in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624 (1995), and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740 (2000), which did not contain jurisdictional requirements, contains a sufficient jurisdictional requirement to overcome a Commerce Clause[5] challenge. In the context of a Hobbs Act, 18 U.S.C. § 1951, prosecution, our court has held that, because of the interstate commerce jurisdictional element, "the Government only needs to establish a minimal effect on interstate commerce to support a violation." United States v.

---

[5] The Commerce Clause provides: "The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U.S. Const. art. I, § 8.

Castleberry, 116 F.3d 1384, 1387 (11th Cir. 1997) (collecting cases from other circuits adopting the minimal-effect standard for interstate commerce under the Hobbs Act).

Relying on the legislative history of § 1028, the Fourth Circuit held that, to prove a violation under § 1028(a), the government need only demonstrate a "minimal nexus" between the fraudulent identification and interstate or foreign commerce. Pearce, 65 F.3d at 24-25. In Pearce, the Fourth Circuit cited with approval the Sixth Circuit's upholding a jury instruction requiring only "'an intent to do acts which, if complete, would have affected interstate commerce.'" Pearce, 65 F.3d at 25 (quoting United States v. Gros, 824 F.2d 1487, 1494-95 (6th Cir.1987)).[6]

---

[6] The definitional instructions approved in Gros regarding an interstate commerce connection included:

> Is In or Affects Interstate Commerce defined: The term "is in or affects interstate commerce" simply means and requires that the prohibited possession has no . . . more than a minimal nexus with interstate commerce. Such a minimal interstate commerce nexus means that the document[] . . . production, transfer or possession has had to have some effect upon interstate commerce. The prohibited act need not be contemporaneous with the movement in or effect upon interstate commerce. . . . Nor is it neces[s]ary that the purpose of . . . the prohibited act be to use or affect interstate commerce. For instance, a showing that a false identification document that was produced or transferred by or was in the possession of a defendant traveled at some time [in] interstate . . . commerce would be sufficient. Moreover, a production or transfer of an identification document which is intended to be distributed or used in interstate commerce would meet this minimal nexus requirement.

17

The Eighth Circuit also has given § 1028(c)(3)(A) an expansive interpretation by noting that "the statute presents two options: possession may be 'in' interstate commerce or it may 'affect' interstate commerce." United States v. Jackson, 155 F.3d 942, 947 (8th Cir. 1998). The Jackson court concluded that the government demonstrates that possession of unlawful identity documents, such as stolen driver's licenses, affected interstate commerce by proof that possession "was integral to [defendant's] scheme to defraud businesses and banks operating in interstate commerce." Id. Consequently, fraudulently inducing a bank to issue a credit card through fraudulent identification documentation would be sufficient evidence of a § 1028(a) violation to satisfy § 1028(c)(3)(A).

The Fifth Circuit has addressed whether a defendant's criminal act involving a fraudulent identification document must actually affect interstate or

---

Furthermore, this minimal nexus requirement is satisfied if you find beyond a reasonable doubt from the evidence in the case the defendant had an intent to do acts which, if complete, would have affected interstate commerce. In this regard, the government . . . is not required to prove that the defendant was aware of the future effect upon interstate commerce, but only that the full extent of the scheme, if successful, would have had such results.

In other words, the government is not required to prove the defendant had knowledge of the interstate commerce nexus.

Interstate Commerce defined: The term "interstate commerce" means commerce between one state and another state. This includes all means of transportation and communication between one state and another state.

Gros, 824 F.2d at 1494-95 (citation omitted).

foreign commerce to satisfy the jurisdictional element of § 1028(c)(3)(A) or whether criminal intent is sufficient. Upholding the defendant's conviction for violation of 18 U.S.C. § 1028(a)(2), transfer of a fraudulent identification document, and specifically addressing the jurisdictional element of § 1028(c)(3)(A) of affecting interstate or foreign commerce, the Fifth Circuit explained:

> When we decide whether a transfer of an identification document or false identification . . . for purposes of 18 U.S.C. § 1028, is in or affects interstate or foreign commerce, we must assume the accused completed his intended goals. . . . [W]e do not focus on whether the identification document actually traveled in interstate or foreign commerce or whether the transfer actually affected interstate or foreign commerce. Rather, <u>we focus on whether the identification document would have traveled in interstate or foreign commerce or whether the transfer would have affected interstate or foreign commerce if [the defendant] had successfully accomplished his intended goals.</u>

United States v. Villarreal, 253 F.3d 831, 834, 835 (5th Cir. 2001) (emphasis added); see Pearce, 65 F.3d at 25 (concluding that the jurisdictional element of affecting interstate commerce is satisfied if the intended criminal act would affect interstate commerce adversely).

Based on the reasoning of the cited cases from the Fourth, Fifth, Sixth and Eighth Circuits, we now hold that the government must prove only a minimal nexus with interstate commerce in a § 1028(a) prosecution to satisfy the "in or

19

affects interstate or foreign commerce" requirement of § 1028(c)(3)(A). The defendant need only have had the intent to accomplish acts, which, if successful, would have affected interstate or foreign commerce. The government, however, is not required to prove that the defendant had knowledge of the interstate commerce nexus when he committed an act in violation of § 1028(a).

In this case, Klopf's possession of fraudulent driver's licenses was an integral part of his identity-theft scheme, and sufficient evidence supports a finding that, even if he had not done so already, he intended to use those driver's licenses in a manner that would have affected interstate commerce significantly, satisfying § 1028(c)(3)(A). Therefore, we affirm Klopf's conviction on Count I for violating § 1028(a) because sufficient evidence supports the jury's finding that he possessed five or more fraudulent driver's licenses and intended to use them for an unlawful purpose, which would affect interstate or foreign commerce under § 1028(c)(3)(A).

B. Conviction for Use of Unauthorized Access Devices

Klopf argues that his conviction on Count II for use of unauthorized access devices under 18 U.S.C. § 1029(a)(2) was improper because the government failed

to prove that he acted with the requisite intent to defraud.[7]  Klopf maintains that he did nothing more than "borrow[] the creditworthiness of unsuspecting individuals to open corporate accounts in order to utilize credit cards because he was unable to apply for credit cards under his own name because of his fugitive status." Appellant's Br. at 21.  Because he made regular payments on the credit card accounts, and all accounts were active at the time of his arrest, Klopf contends that he did not possess the requisite intent to defraud.

To convict a defendant for use of unauthorized access devices, in violation of § 1029(a)(2), the government must prove that the defendant: (1) "knowingly" used "one or more unauthorized access devices"[8]; (2) "with intent to defraud";

---

[7] In relevant part, § 1029(a)(2) provides as follows regarding the intent to use unauthorized access devices:

> (a) Whoever—
>     . . . .
>     (2) knowingly and <u>with intent to defraud</u> traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period
>     . . . .
>     shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

18 U.S.C. § 1029(a)(2).

[8] The statute defines an "access device," such as a credit card, and the corollary, "unauthorized access device":

> As used in this section—
>     . . . .

21

(3) to obtain things having an aggregate value of $1,000 or more during a one-year period; and (4) such use affected interstate or foreign commerce.  18 U.S.C. § 1029(a)(2).  "Intent to defraud has often been defined as 'the specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self.'"  United States v. Peden, 556 F.2d 278, 280 (5th Cir. 1977) (citation omitted).

In this case, the evidence presented at trial and Klopf's own admissions show that he acted with the requisite intent to defraud.  He (1) obtained credit cards from various banks, (2) by purporting to be and using the identifying information of other individuals with better credit ratings, (3) without the knowledge or permission of those individuals or the issuing banks, and (4) subsequently used those credit cards to make numerous purchases and cash

---

> (2) the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);
> . . . .
> (3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.

18 U.S.C. § 1029(e)(1), (3) (emphasis added).

withdrawals totaling more than $30,000 during a one-year period. Klopf clearly intended to deceive the banks into believing that he was the individual named on the various credit cards issued to him. The credit cards involved in this case were unauthorized access devices within the meaning of 18 U.S.C. § 1029(e)(3) because they were "obtained with intent to defraud." Id. It is irrelevant that he subsequently made payments on the cards because, in each application for a credit card, he intended to defraud the banks by representing to them that they were dealing with persons other than himself. See Peden, 556 F.2d at 280.

Concerning the requirement that the access-device fraud affect interstate or foreign commerce, credit cards generally are issued to applicants by out-of-state financial institutions, and credit-card account numbers travel across state lines, both electronically and by mail. By making purchases and withdrawals with the fraudulently obtained credit cards, Kloph engaged in interstate financial transactions. We conclude that a reasonable factfinder could have found that Klopf used the fraudulently obtained credit cards with the intent to defraud the issuing banks both by acquiring the credit cards and using them for purchases and cash withdrawals amounting to more than $30,000 within a year. Consequently, the jury additionally would have found that these transactions affected interstate

23

commerce. Therefore, sufficient evidence supports Klopf's conviction for use of unauthorized access devices as charged in Count II.

C. Requested Jury Instruction

Klopf argues that the district judge abused his discretion by denying Klopf's requested jury instruction, which would have informed the jury that it could not find him guilty of unauthorized use of fraudulent identification documents unless it identified a specific unlawful offense that he had intended to commit. To convict him of a violation of § 1028(a)(3), Klopf contends that the government was required to prove (1) the particular intended use for which he possessed the fraudulent identification documents, and (2) that the intended use would have violated a particular federal, state, or local law. Klopf argues that the jury should not have been permitted to rely on "common sense" in order to determine whether his intended use was unlawful, but rather, should have been informed as to precisely which law his intended conduct would have violated. Appellant's Br. at 26.

We review a district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Roberts, 308 F.3d 1147, 1153 (11th Cir. 2002) (per curiam). "A trial judge's refusal to give a requested instruction will warrant a new trial only if (1) the requested instruction was substantively correct,

24

(2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." Id. In deciding whether a defendant's requested instruction was substantially covered by the actual charge delivered to the jury, we "need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and the law." United States v. Gonzalez, 975 F.2d 1514, 1517 (11th Cir. 1992) (determining that the trial judge abused his discretion by not giving defendant's proposed jury instruction resulting in the jury considering the evidence without the instruction, which caused the defendant to be "seriously impaired from presenting an effective defense").

Our circuit has not addressed whether a violation of § 1028(a)(3) must include a reference to the specific law that a defendant's intended conduct would have violated. The Fourth Circuit reversed a defendant's conviction under § 1028(a)(3) because the district court failed to instruct the jury that her intended conduct must have violated a particular law. United States v. Rohn, 964 F.2d 310, 313-14 (4th Cir. 1992). The Fourth Circuit reasoned that, to sustain a conviction under § 1028(a)(3), "it is necessary that the jury be instructed by the district court that particular conduct would have violated a specific law," and further stated that that requirement "could have been satisfied by, for example, an instruction that

presenting a false driver's license to a police officer violates a law of a state in which appellant could be expected to drive." Id. at 314.

The District of Columbia Circuit, however, determined that the jury instructions were sufficient where the defendant was charged with violating both § 1028(a)(3) and § 1029(a)(2). United States v. Kayode, 254 F.3d 204, 213 (D.C. Cir. 2001). The D.C. Circuit distinguished Rohn because, unlike the defendant in Rohn, who was charged only with a violation of § 1028(a)(3), the defendant in Kayode also was charged with violating § 1029(a)(2). Id. Consequently, the D.C. Circuit concluded that the instructions included a specific law that the defendant's intended conduct would have violated, and, therefore, the instructions were sufficient. Id.

Although the circumstances of this case appear nearly identical to those in Kayode, Klopf attempts to distinguish that case based on the fact that none of the names on the driver's licenses found in Klopf's apartment matched the names on any of the credit cards, whereas, in Kayode, the defendant had both a credit card and a driver's license in the name of the same person. While this distinction may have made the evidence in Kayode more compelling, it does not follow that the district judge's instruction was insufficient in this case. As we have explained, the evidence presented at trial permitted a reasonable jury to infer that Klopf intended

26

to use the driver's licenses as supporting documentation in order to facilitate the use of fraudulently obtained credit cards.  The only difference between this case and Kayode is that Klopf was apprehended before he had the opportunity to obtain credit cards bearing the names of individuals for whom he had fraudulent driver's licenses.  In both cases, however, "the jury was adequately informed both of 'the uses to which [the] appellant intended to put the identifications' and that the 'intended uses would violate one or more federal . . . laws.'"  Id.  (citing Rohn, 964 F.2d at 313).

Klopf's requested instruction that the district judge declined to give states: "In order to convict the Defendant of Count I Fraudulent Identification Documents the Government must [p]rove beyond a [r]easonable doubt that the Defendant intended an unlawful use of the driver['s] licenses.  The unlawful use being

_____

_____."  R1-51 (citing Rohn).  The jury instructions given by the judge as to Counts I and II were as follows:

> Now, Title 18, United States Code, Section 1028(a)(3) makes it a federal crime or offense for anyone to knowingly possess with the intent to unlawfully use five or more false identification documents, such possession being in or affecting interstate commerce.
> The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt.

27

First: That the defendant possessed five or more false identification documents;

Second: That the defendant did so knowingly and willfully with the intent to unlawfully use the false identification documents; and

Third: That the defendant's possession of the false identification documents was in or affecting interstate commerce.

The intent to use false identification documents unlawfully is the intent to sell, pledge, distribute, give, loan, or otherwise use false identification documents knowing that such documents were produced without lawful authority.

A false identification document means a document of a type commonly accepted for purposes of identification of individuals that is not issued by or under the authority of the . . . governmental entity, but appears to be issued by or under the authority of the United States Government or a state or a political subdivision of the state.

The term interstate commerce refers to any transaction or event that involves travel or transportation between a place in one state and a place in another state.

Now, Title 18, United States Code, Section 1029(a)(2) makes it a federal crime or offense for anyone during any one year period to use unauthorized access devices, including ordinary credit cards, if by such conduct a person obtains anything of value aggregating one thousand dollars or more during that period.

The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt.

First: That the defendant knowingly used an unauthorized access device during a one year period, and by such use obtained things of value totaling more than one thousand dollars during that period. . . .

[Second: That] [t]he defendant so acted willfully with knowledge of the unauthorized nature of the access device, and with the intent of defrauding, as charged; and

Third: That the defendant's conduct affected interstate commerce.

The term access device means any credit card, plate, code, account number, electronic serial number, mobile identification

28

number, personal identification number, or other means of account access that can used alone or in conjunction with another access device to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by a paper instrument.

The term unauthorized access device means any access device that is lost, stolen, expired, revoked, cancelled, or obtained with intent to defraud.

The term used includes any effort to obtain money, goods, services, or any other thing of value, or to initiate a transfer of funds with an unauthorized access device.

To act with intent to defraud means to act willfully with intent to deceive or cheat, ordinarily for the purpose of causing financial loss to another, or bringing about financial gain to one's self.

The essence of the offense is the willful use of an unauthorized access device with intent to defraud, and it is not necessary to prove that anyone was in fact deceived or defrauded.

R6 at 471-74 (emphasis added).

First, we note that Klopf's requested jury instruction was incomplete. By using blank lines for the description of the unlawful use of the fraudulently obtained driver's licenses, he implicitly intended for the district judge to complete those lines or to use his own description for the jury in explaining Klopf's intended unlawful use. Consequently, he cannot now complain concerning the judge's instructions regarding Klopf's intended unlawful use of the fraudulently obtained driver's licenses. Consistent with our analysis of unlawful intent as to violation of § 1028(a)(3), Klopf's intended fraudulent use of the false driver's licenses was sufficient to violate § 1028(a)(3), even though this intended unlawful

29

use had not been completed. His obtaining five or more fraudulent driver's licenses to use for an unlawful identification purpose in conjunction with fraudulently obtained credit cards under § 1029(a)(2), which was apparent from the evidence at trial, was sufficient to support his conviction under § 1028(a)(3).

Second, the district judge's explanation to the jury regarding the acts necessary for violation of both § 1028(a)(3) and § 1029(a)(2) are correct statements of those statutes, and the examples he gives clearly explain acts that would constitute violation of the respective statutes. The judge also makes clear that these are federal statutes and that the elements of each of the charged crimes must be proved beyond a reasonable doubt. Third, we agree with the D.C. Circuit that, by being charged with both fraud relating to possession of identification documents and use of unauthorized access devices, in contrast to Rohn, the jury was aware of the entire unlawful scheme. "Thus, the jury was adequately informed both of 'the uses to which appellant intended to put the identifications' and that the 'intended uses would violate one or more federal . . . laws.'" Kayode, 254 F.3d at 213 (quoting Rohn, 964 F.2d at 313).

Therefore, Klopf's incomplete, requested instruction was covered in more detail by the charge delivered to the jurors, which (1) instructed them that they must find that Klopf's possession and intended use of the fraudulent driver's

30

licenses was unlawful, and (2) informed them what conduct would have violated § 1028(a)(3). Klopf's incomplete requested instruction was more fully covered by the charge that the judge delivered to the jury, specifically with the instructions relating to violations of both § 1028(a)(3) and § 1029(a)(2), which worked in conjunction in this case. Klopf was not impaired whatsoever in his ability to present an effective defense to § 1028(a)(3). We conclude that instructions like those delivered in this case, in which the trial judge explained the elements of violating § 1028(a)(3) and § 1029(a)(2), and further described for the jury unlawful acts that violate both statutes, are sufficient instructions. Consequently, the district judge did not abuse his discretion by denying Klopf's incomplete, requested jury instruction concerning § 1028(a)(3).

D. Sentencing Issues

Klopf raises sentencing issues on appeal that challenge his sentencing enhancements,[9] restitution, and supervised release. As an preliminary matter, however, we must address Klopf's sentence under Count I for violating §

---

[9] Specifically, Klopf argues that his rights were violated by (1) the ten-level enhancement for the amount of loss, U.S.S.G. § 2B1.1(b)(1)(F); (2) the two-level enhancement for use of sophisticated means, U.S.S.G. § 2B1.1(b)(8)(C); (3) the two-level enhancement for possession of five or more identification documents unlawfully produced from, or obtained by the use of, another means of identification, U.S.S.G. § 2B1.1(b)(9)(C)(ii); (4) the four-level enhancement for his role as an organizer or leader of a criminal enterprise, U.S.S.G. § 3B1.1(a); and (5) the two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1.

31

1028(a)(3), because the district judge sentenced Klopf to a term of imprisonment that exceeded the statutory maximum sentence. At the time of sentencing, the maximum statutory sentences authorized for Klopf's offenses were three years for Count I for violating § 1028(a)(3), see 18 U.S.C. § 1028(b)(2)(B), and ten years for Count II for violating § 1029(a)(2), see 18 U.S.C. § 1029(c)(1)(A)(i). Under the pre-Booker,[10] mandatory Sentencing Guidelines scheme, the district judge was required to group Klopf's offenses together into a single count and determine the offense level accordingly. See U.S.S.G.§ 3D1.2. After calculating Klopf's offense level and criminal history score, the judge determined that the guideline range was 120 to 150 months and imposed a total sentence of 150 months of imprisonment. This 150-month sentence was Klopf's "total punishment." U.S.S.G. § 5G1.2, comment. (n.1).

The government concedes that Klopf's sentence on Count I was unlawful because it exceeded the maximum statutory term. Appellee's Br. at 46-47. The PSI erroneously states that the maximum authorized imprisonment sentence for Count I is fifteen years, instead of the actual maximum of three years. Neither Klopf nor the government noticed this error in the PSI and brought it to the attention of the sentencing judge. Apparently, in reliance on the erroneous PSI,

---

[10] United States v. Booker, __ U.S. __, 125 S.Ct. 738 (2005).

the judge incorrectly sentenced Klopf to an imprisonment term of 150 months on Count I, which exceeded the statutory maximum. Because the judge thought that he could achieve the total punishment by sentencing Klopf to 150 months of imprisonment on Count I, he imposed concurrent sentences. Therefore, remand is necessary so that the district judge can resentence Klopf within the appropriate statutory maximum of three years for Count I for violation of § 1028(a)(3).

Klopf, however, was convicted and sentenced on a two-count indictment, and his crimes of conviction are interdependent: fraud connected with possession of identification documents and use of access devices. """Multiple count convictions present the trial judge with the need for a sentencing scheme which takes into consideration the total offense characteristics of a defendant's behavior. When that scheme is disrupted because it has incorporated an illegal sentence, it is appropriate that the entire case be remanded for resentencing.""" United States v. Hernandez, 145 F.3d 1433, 1441 (11th Cir. 1998) (citations omitted); see United States v. Mixon, 115 F.3d 900, 903 (11th Cir. 1997) ("'If a multicount sentence is a package—and we think it is—then severing part of the total sentence usually will unbundle it.'" (citation omitted)). Klopf's sentence additionally involved application of the Sentencing Guidelines, which inter-relate the facts and characteristics of the defendant's unlawful participation to the crimes of

33

conviction. Calculating a sentence that encompasses both a statutory sentence and the Sentencing Guidelines involves an interconnected decision by the district judge to determine an appropriate sentence that fulfills his or her considered resolution of statutorily established sentences with appropriate Sentencing Guidelines enhancements. See United States v. Watkins, 147 F.3d 1294, 1297 (11th Cir. 1998) ("[T]he district court viewed [the convicted defendant's] sentence as a 'package' and took into account 'the nature of the crime, certain characteristics of the criminal, and the interdependence of the individual counts.'" (citation omitted)). That composite sentencing decision is interrupted or unbundled by vacating one of the necessary components, the sentence on a count of conviction, as in this case. The district judge on remand for resentencing will "recalculate and reconsider" Klopf's "entire sentencing package" to impose a sentence that he determines is appropriate for the crimes of conviction under the Booker advisory sentencing scheme as to application of the Sentencing Guidelines. Id.

Additionally, the sentencing judge made clear that he felt constrained to give Klopf a sentence under the Sentencing Guidelines that was insufficient to punish him for the identity crimes that he had committed, complete with the ramifications of his criminal acts:

34

THE COURT: The Court finds that this identity theft is the worst type of personal invasion of privacy. It's in many ways worse than somebody burglarizing your home, I mean to literally steal your identity. The Court totally abhors this type of conduct.

But with respect to consideration of a motion for upward departure, that is to go outside of the Guidelines that have been proscribed, the Court must find that this case is outside of the heartland, that there is something about this case that's different from other cases involving identity theft.

The Court has already found that this was sophisticated. And the Court under the Guidelines granted a two level enhancement based on sophistication.

The Court has found that the defendant was an organizer or a leader, and that the criminal activity was extensive. The Court's already added four levels because of that.

The Court's found that the defendant obstructed justice. The Court added two levels for that. The Court added ten levels as a result of the loss or intended loss exceeding one hundred and twenty thousand dollars.

And believe me, I don't fault the government for asking for it. <u>And if there was a way that I could legally grant the upward departure, believe me, I would. I think Mr. Klopf deserves the harshest sentence that the law permits. But the bottom line is, the Court finds that the law does not permit an upward departure.</u>

And accordingly, the harshest sentence that the Court can impose under these circumstances is a hundred and fifty months, which exceeds ten years. And that's certainly a lot of time. So based on that, the Court will respectfully deny the motion for upward departure.

R8-101 (emphasis added).

Since Klopf's sentencing, the Supreme Court has decided <u>United States v. Booker</u>, __ U.S. __, 125 S.Ct. 738 (2005), which held that the Sentencing Guidelines are advisory in application and not mandatory. "As a result of

Booker's remedial holding, Booker error exists when the district court misapplies the Guidelines by considering them as binding as opposed to advisory." United States v. Shelton, 400 F.3d 1325, 1331 (11th Cir. 2005). Based upon the district judge's commentary at sentencing, Booker error is obvious. This is further reason that Klopf must be resentenced in addition to "our established precedent" that vacating the sentence for one count disrupts the sentencing package and requires resentencing for all counts of conviction. Hernandez, 145 F.3d at 1440. Because of the many sentencing considerations now involved post-Booker and the potential of Klopf's receiving a greater sentence at resentencing,[11] as well as his pro se representation in this case to date, we strongly recommend that the district judge appoint counsel for Klopf's resentencing on remand. Because we are vacating Klopf's sentence in its entirety to give the district judge the ability to reconsider the sentence as a complete sentencing package post-Booker, we need not address Klopf's sentencing issues relating to his sentencing enhancements, restitution, and supervised release.

---

[11] Based upon "'the interdependence of the multiple counts for sentencing purposes,'" we have upheld a longer Sentencing Guidelines sentence at resentencing because "a district court had jurisdiction to recalculate a defendant's entire sentence and . . . such resentencing did not defeat the defendant's double jeopardy rights nor expectations of finality." United States v. Oliver, 148 F.3d 1274, 1274 (11th Cir. 1998) (citation omitted).

## III. CONCLUSION

On appeal, Klopf has challenged his convictions under §§ 1028(a)(3) and 1029(a)(2) for sufficiency of evidence and the denial of his requested jury instruction as well as his sentence concerning the enhancements, restitution, and supervised release. As we have explained herein, we **AFFIRM** his convictions, but we **VACATE** his sentence and **REMAND** for resentencing under the proper statutory sentence and in view of Booker, consistent with this opinion.