[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14955
Non-Argument Calendar

_____

D. C. Docket No. 05-80210-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AMAURY HERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 8, 2008)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Amaury Hernandez appeals his convictions and 121-month total sentence for conspiracy to distribute at least one kilogram of heroin, in violation of 21 U.S.C. §§ 846 and 841, and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841. On appeal, Hernandez first argues that there was insufficient evidence produced at trial to support his convictions. Specifically, he asserts that he only allegedly engaged in individual buy-sell transactions, and thus there was no conspiracy, he never was caught with heroin, and the evidence supported his theory of innocence. Second, he argues that the district court erroneously sentenced him based on prior convictions that were not alleged in the indictment or proven beyond a reasonable doubt at trial.

The record contains sufficient evidence to support each of the charges against Hernandez. Moreover, the district court did not plainly err in considering Hernandez's prior convictions at sentencing even though they were not alleged in the indictment or found by the jury. The record does not indicate that the prior convictions affected his total sentence, and binding Supreme Court precedent forecloses his argument on this point. Accordingly, we AFFIRM his convictions and sentence.

# I. BACKGROUND

A federal grand jury charged Hernandez and other co-defendants in a ten-count indictment with: (1) conspiracy to distribute at least one kilogram of heroin, in violation of 21 U.S.C. §§ 846, 841 (Count 1); and (2) possession with intent to distribute heroin, in violation of 21 U.S.C. § 841 (Count 4). Count 1 alleged that the conspiracy involved Hernandez, Mario Padilla, Sabino Eugene Rosario ("Sabino"), Daniel Rosario ("Daniel"), and others. Count 4 charged that the heroin possession occurred on or about 13 September 2005. A superceding indictment charged Hernandez with the same two counts. Hernandez pled not guilty to the charges.

At trial, Richard Bonner, a DEA agent, testified that in August 2004 the DEA became aware of the drug trafficking activities of Sabino and his brother Frank Rosario ("Frank"). R4 at 217, 225-26. After further investigation, the DEA obtained a wiretap for Sabino's phone, which he used to conduct heroin trafficking activities. Id. at 226-27. The DEA identified Padilla and Carlos Borges as sources of supply for Sabino, and the DEA obtained wiretaps for those individuals' phones as well. Id. at 231-32. Based on information obtained from the Padilla wiretap, the DEA obtained a wiretap for Hernandez's phone. R5 at 249.

Bonner testified that the DEA intercepted a call between Hernandez and Padilla on 23 August 2005, during which Hernandez said that "he wanted to show Padilla some slides." Id. at 308-09. Bonner believed that "slides" meant heroin. Id. at 309. A call from Hernandez to Padilla later on 23 August indicated that they met at Padilla's house that day, and a call between Padilla and Kervin Reyes on 24 August indicated that Hernandez brought something with him to the 23 August meeting. Id. at 313; Binder, Gov't Exhs. 43, 44.

Bonner testified that in a call between Hernandez and Padilla on 13 September, Hernandez stated that he had "some flyers" that "came out perfect" and "the shit is better, but a little lower." R5 at 315; Gov't Exh. 45. Padilla asked Hernandez whether the "ticket" was "still the same on them." R5 at 315; Gov't Exh. 45. Bonner interpreted that to mean that Hernandez had good heroin, Padilla was asking about the price of the heroin, and the price was a little lower. R5 at 315.

Hernandez and Padilla agreed to meet at Padilla's residence on the evening of 13 September, but Hernandez got into an auto collision on his way there. R5 at 316-17; Gov't Exh. 47. After the collision, Hernandez contacted Padilla to have Padilla "come over here real quick so you could get this shit out." Gov't Exh. 48. Bonner testified that an undercover DEA agent went to the scene of the collision,

4

but the DEA agent decided not to seize anything for his safety and to avoid alerting the drug organization that law enforcement was watching. R5 at 318-19. An hour after the accident, Padilla called Hernandez to "talk numbers," and Hernandez indicated that the price was "56." R5 at 322; Gov't Exh. 50. Hernandez indicated that he had given Padilla "like 1-0 somthin [sic]," and Padilla stated that he needed "at least 250," so Padilla needed "150" more. Gov't Exh. 50. Bonner interpreted this to mean that Hernandez was asking for $56 per gram of heroin, Hernandez had given Padilla about 100 grams, and Padilla needed another 150 grams from Hernandez. R5 at 320-22.

According to Bonner, calls between Hernandez and Padilla on 14 September 2005 indicated that Hernandez was attempting to acquire the additional 150 grams of heroin from an unidentified source. Id. at 323-24; Gov't Exhs. 51, 52. Bonner stated that Padilla also spoke to Sabino on 14 September, and Padilla told Sabino that he had about half of the 224 grams of heroin that Sabino wanted and was waiting on the other half. R5 at 325-26. An hour later, Padilla spoke with Hernandez, and according to Bonner, Hernandez said that he would have the heroin by three o'clock. Id. at 327. Padilla told Hernandez that another person was waiting for Padilla to acquire the additional heroin. Id. In a later call, Padilla told Hernandez that "they waitin [sic] on me, so, I'm waitin [sic] on you," to which

5

Hernandez replied, "call 'em like in ten minutes so you don't keep them waiting."

Gov't Exh. 61. Hernandez told Padilla that he was on his way to Padilla's house, which led Bonner to believe that Hernandez met with Padilla in the evening on 14 September. Id.; R5 at 331, 336-38. Later that evening, calls indicated that Daniel picked up heroin from Padilla and brought it back to Sabino. R5 at 338-40. Sabino complained about the quality of the heroin to Padilla, and Padilla informed Hernandez that the customers did not like the heroin transferred on 14 September by saying, "Them folks told me that's not what it's meant to be." Gov't Exh. 70; R5 at 340-42.

Bonner further testified that Hernandez and Padilla negotiated a heroin deal on 12 October 2005. R5 at 351-52. Specifically, Padilla asked Hernandez if he was "shaking anything," and told Hernandez that Padilla was "in need." Gov't Exh. 72. Hernandez responded that he was "gonna see" and he would make a call. Id. A day later, Hernandez spoke with an unidentified male, who had about "36 pesos." R5 at 355; Gov't Exh. 74. Bonner believed that "36 pesos" was code for about 36 grams of heroin and the unidentified male was Hernandez's heroin source. R5 at 355-56, 359. Four minutes later, Hernandez called to tell Padilla that he had a "small amount." Gov't Exh. 75. Although Padilla was dismayed with the small amount, Padilla said that he "can't be picky right now," and

6

"whenever you're ready, let me know." Id. Hernandez then called the unidentified male again and told him that Hernandez wanted whatever he could "scrape up." R5 at 358.

Later that day, agents followed Hernandez when he drove to the house of an unidentified male. Id. at 360. The unidentified male gave Hernandez a black bag through the window of his vehicle. Id. at 360-61. As Hernandez was leaving the male's house, the surveillance team pulled him over but did not find any contraband. Id. at 361. The black bag contained promotional flyers for a band. Id. Hernandez told Padilla about the traffic stop and confirmed to Padilla that he was "clean." Id. at 362; Gov't Exh. 78. Padilla told Hernandez to call if he felt better later, but Padilla acknowledged that "I guess we are just going to have to wait." Gov't Exh. 78 at 5; R5 at 362.

According to Bonner, based on intercepted calls, DEA agents believed that Hernandez was planning to obtain heroin from his source the next day, 14 October 2005. R5 at 362-63. After the suspected exchange, agents surreptitiously searched Hernandez's vehicle, but they did not find any heroin inside. Id. at 365-66.

On cross examination, Bonner testified that no forensic evidence linked Hernandez to any specific drugs in the case and there was no evidence of how

Hernandez financially profited from anything outside of his job as a barber. Id. at 378, 395-96.

Next, Sabino Rosario testified that he was selling one kilogram of heroin every week and a half prior to his arrest on 21 December 2005. Id. at 430; R6 at 443. He paid street-level dealers to sell the heroin on his behalf. R5 at 433. He obtained the heroin, in part, from Padilla, but he did not know Hernandez. R5 at 435; R6 at 489-90.

Sergeant Randy Collier, of the Lake Worth Police Department, testified that he was assigned to work with the DEA on a heroin investigation involving Sabino. R6 at 529. Collier, who was conducting surveillance, observed Hernandez standing next to his vehicle after the car accident on 13 September 2005. Id. at 531, 539-41. He saw Hernandez retrieve a blue bag from the trunk, Hernandez looked anxious, and then Padilla drove up, took the bag from Hernandez, and drove off. Id. at 546-47.

Daniel Rosario testified that he worked as a heroin courier for his brother, Sabino. Id. at 586-87. He had obtained heroin from Padilla on 14 September 2005, but never had received anything like flyers from Padilla. Id. at 619. He did not know Hernandez prior to his arrest. Id. at 620.

Padilla testified that he obtained heroin from several sources including Hernandez at least once a week and he started dealing heroin in the latter part of 2004. R7 at 882, 884.  He then dealt that heroin to several different people, but after he met Sabino in 2005, he dealt mainly to Sabino.  Id. at 884-85; R8 at 918. Padilla initially sold Sabino about four ounces of heroin every week or ten days but that increased to about eight ounces every week as Padilla became more comfortable with Sabino.  R8 at 919-22.  Sabino did not use the heroin, but Sabino's buyers did use it.  Id. at 932.

When Padilla spoke with Hernandez about heroin, he would sometimes use code words such as "slides" and "flyers." Id. at 927-28.  Padilla never got or purchased actual slides, flyers, or brochures from Hernandez.  Id. at 974.  Padilla used code words when talking to Hernandez about heroin on the phone in order to keep the conversations regarding heroin "as minimal as possible."  Id. at 931.

Padilla testified that Hernandez began providing him with heroin in quantities of 100 grams but that increased to as much as 250 or 500 grams.  Id. at 930; R9 at 1127.  Padilla conducted at least four heroin transactions with Hernandez and possibly as many as eight or nine.  R9 at 1126.  There were "[q]uite a few" other occasions when Padilla placed an order with Hernandez, but Hernandez was unable to find any heroin.  Id. at 1128.  On 23 August 2005,

9

Hernandez left Padilla a sample of 100 grams of heroin after they met. R8 at 963-65. On 13 September 2005, Padilla negotiated a heroin transaction on the phone with Hernandez in coded language, and Hernandez agreed to bring the heroin to Padilla. R8 at 970-71, 975. Hernandez drove into a collision on his way to Padilla's house, and Padilla met him at the accident site and took a bag from him. Id. at 983-86. The bag did not contain flyers, but rather, it contained about 100 grams of heroin. Id. at 987-88, 991. Padilla was planning to sell the heroin he purchased from Hernandez to Sabino. Id. at 996-97. Padilla confirmed that he and Hernandez were speaking about heroin in their coded conversations on 14 September 2005 as well. Id. at 997-99.

Following Padilla's testimony, the government rested its case-in-chief, and Hernandez chose not to present any testimony. R9 at 1135. Hernandez then moved for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29, and the district court reserved ruling on the motion so it could consider Hernandez's closing argument. Id. at 1135-36. Ultimately, the jury returned a verdict finding Hernandez guilty on Counts 1 and 4. R1-391. After trial, Hernandez moved for a new trial and renewed his motion for judgment of acquittal, and the district court summarily denied the motions. R1-395, 402.

Following the trial and prior to sentencing, a probation officer completed a Presentence Investigation Report ("PSI"), which stated facts generally consistent with those adduced at trial. PSI ¶¶ 19-45. The PSI assigned Hernandez a base offense level of 32, under U.S.S.G. § 2D1.1(a)(3), because the offenses involved at least 1 and less than 3 kilograms of heroin. PSI ¶ 93. The PSI listed Hernandez's prior criminal convictions, which included one conviction for carrying a concealed firearm and two convictions for driving with an expired driver's license. Id. ¶¶ 103-05. The PSI assigned Hernandez one criminal history point for the concealed firearm conviction, but none for the other two convictions, and determined that he fell into criminal history category I. Id. ¶¶ 103-06. With a criminal history category of I and total offense level of 32, the Guidelines imprisonment range was 121-151 months' imprisonment. Id. ¶ 132. The mandatory minimum sentence for Count 1 was 120 months' imprisonment. Id. ¶ 131. Hernandez did not file any objections to the PSI. PSI Addendum.

At sentencing, Hernandez did not raise any objections and did not object to the government's two minor factual PSI corrections. R10 at 1246-49. The district court then adopted the Guidelines calculations and recommended imprisonment range from the PSI. Id. at 1248-49. Counsel for Hernandez requested a low-end Guidelines range sentence, and Hernandez declined to speak on his own behalf. Id.

11

at 1250-51. The court noted that it was "concerned" about his prior concealed firearm conviction. Id. at 1255. After considering the 18 U.S.C. § 3553(a) factors, the court imposed low-end Guidelines range sentences of 121 months' imprisonment on Counts 1 and 4, to be served concurrently and a total term of 5 years' supervised release. Id. at 1255-56. Hernandez did not object following the announcement of his sentence. Id. at 1259. The court entered judgment accordingly, and Hernandez timely appealed. R1-488, 491.

## II. DISCUSSION

### A. Sufficiency of the Evidence

On appeal, Hernandez argues that sufficient evidence did not support his convictions because law enforcement officers searched him on multiple occasions but never caught him in possession of heroin. He asserts that his references to flyers were not coded references to heroin but true references to music flyers, and the evidence proved that theory. He also cites cases for the propositions that a mere buy and sell agreement cannot constitute a conspiracy, and an agreement to sell drugs for a buyer's personal drug habit cannot prove a conspiracy.

We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and accepting all reasonable inferences in favor of the verdict. United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir.

12

2005).  If a reasonable trier of fact could find that evidence established guilt beyond a reasonable doubt, the evidence is sufficient to support a conviction even if evidence might also support a defendant's theory of innocence.  United States v. Tinoco, 304 F.3d 1088, 1122 (11th Cir. 2002).

"In order to sustain a conviction for conspiracy with intent to distribute, the government must prove that an agreement existed between two or more persons to violate the narcotics laws, that the defendant knew of the conspiratorial goal, and that he knowingly joined or participated in the illegal venture."  United States v. Guerrero, 935 F.2d 189, 192 (11th Cir. 1991). The government may use circumstantial evidence to meet its burden of proof.  Id.  For example, "[t]he government may establish a defendant's knowing participation in the conspiracy through proof of . . . acts committed by the defendant that furthered the purpose of the conspiracy."  Id.  "The government does not have to prove that the alleged conspirator knew all of the details of the conspiracy or that he participated in every phase of the scheme."  Id.

Evidence of a simple buy-sell relationship, even if continuing, would not support a conspiracy charge, just as evidence of an agreement to sell drugs only to "support the buyer's personal drug habit is antithetical to a finding of conspiracy." United States v. Dekle, 165 F.3d 826, 829-30 (11th Cir. 1999).  However, a

13

conspiracy exists where the parties have a joint criminal objective, such as when a defendant is involved in series of drug transactions between mid-level drug distributors and street-level dealers with the "common goal of maximizing the cash returns of the business through the distribution of drugs." Id. at 829.

To support a conviction for a substantive charge of possession with intent to distribute drugs, the government "must establish that the defendant knowingly possessed the controlled substance with the intent to distribute it." Guerrero, 935 F.2d at 192. Direct or circumstantial evidence may be used to prove these elements. Id.

Sufficient evidence supported Hernandez's convictions for conspiracy to distribute and possession with intent to distribute heroin. Regarding the conspiracy conviction, Padilla testified that Hernandez provided him with heroin on at least four and possibly up to nine occasions, which was evidence of an agreement to violate the federal drug laws. R9 at 1126-27. Additionally, the government captured Hernandez and Padilla engaging in coded phone conversations on 23 August 2005, where Hernandez spoke about showing Padilla some slides, and on 14 September, where Padilla talked about Hernandez getting something because another person was waiting on Padilla. R5 at 308-09, 327. Padilla confirmed that these conversations involved heroin sales. R8 at 963, 997-99. This evidence

14

demonstrated that Hernandez was knowingly selling heroin to Padilla, and he knew that Padilla was selling it to another buyer. Therefore, there was circumstantial evidence that Hernandez knew of the goal of the conspiracy, to maximize cash returns by distributing heroin, and he knowingly joined it. See Dekle, 165 F.3d at 829-30. The agreement was sufficient to support the conspiracy charge because it went beyond a simple buy-sell relationship regarding drugs purchased for personal use, and evidence showed that Hernandez understood that Padilla was re-selling the heroin to another buyer. See id.

Regarding the possession with intent to distribute heroin conviction, the government presented coded phone conversations from 13 and 14 September, along with Bonner's and Padilla's testimony that Padilla negotiated and consummated a heroin deal with Hernandez on 13 September. R5 at 315-17; R8 at 970-71, 987-88. A reasonable juror could have concluded that Hernandez possessed heroin even though he was not caught with it because there was evidence that Hernandez obtained heroin and sold it to Padilla.

Notably, the fact that some of the aforementioned evidence came from coded conversations does not render the evidence insufficient. The jury was free to draw inferences against Hernandez based on these conversations as well as Padilla's and Bonner's testimony, and reject Hernandez's alternate interpretation. See Tinoco,

15

304 F.3d at 1122. Hernandez's argument that evidence did not establish his possession of heroin, because he was not caught with heroin, must fail because ample circumstantial evidence established possession, which was sufficient to satisfy that element. See Guerrero, 935 F.2d at 192. Hernandez's argument that the "flyers" were music flyers, and not heroin, also must fail because the evidence was sufficient to support his convictions, even though it also might have supported his theory of innocence. See Tinoco, 304 F.3d at 1122.

Because sufficient evidence supported the charges against Hernandez, we affirm his convictions.

## B.    Propriety of the Sentence

Hernandez argues that the district court violated his Fifth and Sixth Amendment rights when it imposed the 121-month total sentence, because the indictment did not mention his prior offenses and the jury did not make any findings regarding prior offenses. He acknowledges that the Supreme Court and our court have rejected this argument in prior cases, including Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), but appears to assert that Almendarez-Torres should be overturned.

We review alleged constitutional errors in sentencing for plain error if the defendant did not first object to the error before the district court. United States v.

16

Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). Under the plain error standard, an appellant must demonstrate: (1) error; (2) that was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id.

"In Almendarez-Torres [], the Supreme Court held that the government need not allege in its indictment and need not prove beyond a reasonable doubt that a defendant had prior convictions for a district court to use those convictions for purposes of enhancing a sentence." United States v. Marseille, 377 F.3d 1249, 1257 (11th Cir. 2004). That holding was left undisturbed by the Court's subsequent decisions leading to and including United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). See Marseille, 377 F.3d at 1257. Specifically, the Court in Booker stated: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, 543 U.S. at 244, 125 S.Ct. at 756 (opinion of Stevens, J.). We have reaffirmed that Almendarez-Torres remains binding law until the Court determines otherwise. United States v. Orduno-Mireles, 405 F.3d 960, 963 (11th Cir. 2005).

The district court did not plainly err in sentencing Hernandez. First, his argument must fail because the Court's holding in <u>Almendarez-Torres</u> directly contradicts his position, and that decision remains binding on us. <u>See</u> <u>Orduno-Mireles</u>, 405 F.3d at 963. In addition, the record does not demonstrate that the district court enhanced Hernandez's sentence based on any prior convictions. Specifically, the district court did not use the prior convictions to enhance his offense level, his criminal history category remained at I despite the prior convictions, and the court imposed the low-end Guidelines range sentence. <u>See</u> R10 at 1248-49, 1255-56. Accordingly, the district court did not plainly err, and we affirm Hernandez's sentence.

## III. CONCLUSION

Because the record contains sufficient evidence to support each of the charges against Hernandez and because the district court did not plainly err in considering Hernandez's prior convictions, we **AFFIRM.**